977 A.2d 1050

BOARD OF EDUCATION OF THE CITY OF CLIFTON, PLAINTIFF–
RESPONDENT/CROSS–APPELLANT, v. ZONING BOARD OF
ADJUSTMENT OF THE CITY OF CLIFTON, DEFENDANT,
AND VAN NESS FAMILY TRUST, DEFENDANT/INTERVE-
NOR-APPELLANT/CROSS-RESPONDENT, AND PROLOGIS 230
BRIGHTON, LLC, DEFENDANT–INTERVENOR.

Superior Court of New Jersey
Appellate Division

Argued April 20, 2009—Decided September 2, 2009.

Before Judges CARCHMAN, R.B. COLEMAN and SIMONELLI.

*Charles Rabolli, Jr.,* argued the cause for appellant/cross-respondent Van Ness Family Trust (*Carlet, Garrison, Klein & Zaretsky, L.L.P.,* attorneys; *Mr. Rabolli* on the brief).

*Anthony V. D'Elia* argued the cause for respondent/cross-appellant Board of Education of the City of Clifton (*Chasan, Leyner & Lamparello,* attorneys; *Mr. D'Elia,* of counsel and on the brief; *Jordan S. Friedman,* on the brief).

The opinion of the Court was delivered by

SIMONELLI, J.A.D.

Defendant-intervenor Van Ness Family Trust (Van Ness) appeals from the August 30, 2007 Law Division order and final judgment reversing the decision of defendant Zoning Board of Adjustment of the City of Clifton (Zoning Board) denying the application of plaintiff Board of Education of the City of Clifton (BOE) for a use variance to convert a vacant warehouse located in an industrial zone into a 500–student annex to Clifton High School (CHS). The BOE cross-appeals from the November 22, 2006 Law Division order and final judgment remanding the matter to the Planning Board of the City of Clifton (Planning Board).

On appeal, Van Ness contends, in part, that the trial judge erred: (1) in not finding that the BOE's notice of the hearing on the application required by *N.J.S.A.* 40:55D–11 was defective; (2) in remanding the matter to the Planning Board rather than affirming the denial of the variance due to the BOE's failure to comply with *N.J.S.A.* 40:55D–31a; (3) in not permitting the sub-

mission of the Planning Board's record to the Zoning Board; (4) in finding the application consistent with the master plan as a matter of law; (5) in substituting his opinion of the witnesses for that of the Zoning Board; (6) in his expansive view of the Educational Facilities Construction and Financing Act, *N.J.S.A.* 18A:7G–1 to –48, (EFCFA or Act); (7) in failing to correct the Zoning Board's wrongful foreclosure of various areas of the objectors' inquiry; and (8) in making numerous factual and legal errors.

On cross-appeal, the BOE contends, in part, that the Zoning Board's decision was arbitrary, capricious, and unreasonable and was based on unsupported or unreliable factors and/or net opinions, and that the trial judge erroneously remanded the matter to the Planning Board. We affirm.

### Background

We summarize the facts from the extensive record. Due to overcrowding at CHS, the BOE decided to acquire property for the construction of a 500–student ninth-grade annex. An advisory committee was established to investigate possible sites for the proposed school. The committee recommended Latteri Park; however, the City's voters rejected that recommendation in a referendum. The committee also recommended, and the voters approved, a three-acre site located at 290 Brighton Road, Clifton (the property), which housed a vacant warehouse that the BOE would convert into the proposed school. Although the property is in the Allwood section of Clifton, which is primarily a single-family residential neighborhood with industrial and commercial uses located along a railroad line, it is located in the M–2 general industrial zone, where schools are not permitted. Accordingly, a use variance was required for the proposed school.

Prior to acquiring the property and proceeding with the project, the BOE submitted to the State Department of Education (DOE) an application for land acquisition pursuant to the Act and *N.J.A.C.* 6A:26–7.1. In connection with the application, the BOE had to submit a letter from the Planning Board indicating that the Planning Board had reviewed the project's site plan.

On September 22, 2004, the BOE wrote to the City planner about the project and included a schematic site plan and building floor plan.[1] The BOE requested a letter from the Planning Board that it had reviewed the schematic site plan. The letter also indicated that the BOE would make a formal application to the Planning Board "when the bond referendum passes in December 2004 and the project becomes a reality."

Dennis Kirwan (Kirwan), the then City planner, responded by letter, dated October 1, 2004, that he had reviewed the site plan; however, he provided no comments and, instead, posed several questions for which he requested answers. Without answering the questions, the BOE submitted Kirwan's letter to the DOE. Because the DOE approved the project on November 3, 2004, it apparently deemed the letter sufficient to satisfy the BOE's obligation to obtain recommendations from the Planning Board.

On April 25, 2005, the BOE submitted an application to the Zoning Board for a use variance to convert the vacant warehouse into a school. Thereafter, on May 19, 2005, the BOE acquired title to the property from Mayer Textile Machine Corporation (Mayer). Mayer also owned adjacent property located at 310 Brighton Avenue, on which it operated a business. The BOE granted Mayer an easement near the rear of the property, which would permit ingress and egress of large tractor trailers delivering goods to Mayer's loading dock. A fence would separate the two properties, and in order for Mayer to access the easement, a sliding gate would have to be opened.[2]

A partially-occupied, light industrial/warehouse property is located on the other side of the property. To the east/rear of the property are railroad tracks; to the west, across Brighton Road, is

---

[1] The BOE wrote to the former city planner, Robert Ringelheim.

[2] Evidence indicated that the easement would be necessary even if Mayer had sold the property to another industrial user instead of the BOE, and that there would be a greater risk of conflict between two industrial uses than between one industrial use and a school.

a large residential zone in which schools are a permitted use, consisting of single family residential dwellings and a 9.3 acre public park, with playing fields directly opposite the property. There is a twenty-five mile per hour speed limit along Brighton Road, and on-street parking is permitted along both the northbound and southbound travel lanes. Videotape evidence shows the residential side of the road, which is a typical suburban neighborhood with well-kept homes and lawns and the industrial side, which exists in campus-like settings, set back and separated from the road by large trees and well-maintained.

The BOE sent notice to all affected property owners, indicating that a public hearing on its application was scheduled before the Zoning Board for August 17, 2005. On August 2, 2005, the BOE notified Kirwan of the hearing date.

After the hearing, on August 29, 2005, Kirwan wrote to the DOE about "serious issues with the application." Specifically, he advised the DOE that the BOE had not applied to the Planning Board as required by *N.J.S.A.* 40:55D–31a, and thus, the DOE should not have approved the project. He also claimed that the project was not consistent with the City's 2003 master plan, and that the site plan contained several basic design flaws. He demanded that "all actions on this application be stopped."

On September 27, 2005, the DOE responded that it was satisfied that the BOE had met it's obligations under *N.J.S.A.* 40:55D–31, and that it had considered Kirwan's concerns, but nonetheless, affirmed its approval of the project.

### The Master Plan and the First Hearing
### Before the Zoning Board

The Zoning Board held nineteen hearings between August 17, 2005 and April 19, 2006, during which it heard testimony about whether the proposed school was consistent with the master plan. The master plan notes that the City is "a fully developed community, with few remaining developable vacant lots." It is "the seventh largest city in New Jersey ... primarily developed as a

residential community composed mostly of single-family detached and two-family dwellings," although it also has "a declining industrial base."

The master plan also notes that "[t]his established development pattern suggests that the City's future land use planning issues will revolve primarily around the community's response to redevelopment of existing sites, rehabilitation, and/or adaptive reuse of existing buildings and sites." No new industrial areas were proposed, and the decline of the City's industrial base was cited as an opportunity for the City "to pursue revitalization and redevelopment efforts" that would promote "the growth of the City's employment base, reinvestment in the public infrastructure, and an increase in the City's tax base."

The master plan established fourteen "general objectives." Those most frequently cited at the hearings are:

1. To encourage City actions to guide the appropriate use or development of all lands in Clifton which will promote the public health, safety, morals and general welfare.

. . . .

3. To provide adequate light, air and open space.

. . . .

5. To promote the establishment of appropriate densities and concentrations that will contribute to the well being of persons, neighborhoods, communities and regions and preservation of the environment.

6. To encourage the appropriate and efficient expenditure of public funds by the coordination of public development with land use policies. . . .

The master plan also established twenty-one goals with accompanying policy statements. Those most frequently cited at the hearings are:

*Goal 1:* To continue to encourage a balance of land uses with diversified residential areas, commercial areas to serve the residents of Clifton and nearby communities, and office and industrial areas to provide jobs and strengthen the tax base.

 *Policy Statement 1:* The City of Clifton recognizes that one of its most significant attributes is a balanced distribution of land uses. The Plan's land use recommendations are designed to protect and reinforce the prevailing residential development patterns in the community, and preclude any introduction of incompatible non-residential uses in these neighborhoods or expansion of existing nonconforming uses. The recommendations are also designed to encourage commercial and industrial uses in established commercial areas through appro-

priate land use controls, and provide for infill development compatible to the uses and intensities to the levels, and locations of the established neighborhood.

. . . .

*Goal 6:* To encourage the re-use, rehabilitation or reconstruction of older non-residential areas and existing commercial and industrial structures which have been vacated for potential re-use as appropriate non-residential uses in order to maintain a balance of land uses, existing jobs and to produce new jobs. Environmentally safe uses should be encouraged in such re-use, rehabilitation or reconstruction should be accomplished.

*Policy Statement 6:* The City seeks to address the continuing loss of the manufacturing base by encouraging the adaptive reuse of older, obsolete industrial facilities. It is the policy of the city to promote the re-use of these facilities as non-residential uses in order to maintain the vitality of the employment base in the City and a balanced land use distribution; provide a comprehensive and coordinated plan to guide the redevelopment and necessary physical improvements; and plan for the redevelopment of vacant commercial and industrial structures as well as industrial complexes that are available to public and private redevelopment efforts. The city should actively promote the continued revitalization of existing commercial areas, identify potential parcels for redevelopment, and seek State and County funds earmarked for commercial revitalization.

. . . .

*Goal 9:* To provide adequate community facilities to serve Clifton's residents in terms of schools, parks and playgrounds, libraries, senior citizens centers, fire houses and other municipal buildings. A principal goal of this plan is to provide and preserve the community services for Clifton's residents, businesses and industry in terms of police and fire protection, adequate sanitary and storm sewers, street cleaning, snow removal, garbage disposal, health services, recreational programs, day care centers and senior citizen services.

*Policy Statement 9:* The city seeks to provide the minimum level of infrastructure improvements to accommodate local needs, and discourage the imposition of new or expanded facilities that may be utilized to encourage or support higher levels of development than contemplated in this plan. A principal goal of this plan is to encourage infrastructure improvements that would enhance the city's community facilities and service provided without resulting in increased pressures for more development in the community. The city's land use policy is expressly designed to discourage infrastructure improvements that would result in increased development pressures on the City's environmental features and, specifically, in the Garrett Mountain area.

. . . .

*Goal 13:* To enhance community appearance and the visual environment by encouraging good design for new and rehabilitated buildings.

*Policy Statement 13:* The imposition of design standards can enhance and assure that sites are developed in an attractive manner consistent with sound planning design criteria. This can be best reinforced by appropriate controls regarding building placement, lighting, signage, landscaping, parking, circulation,

architectural details, and related elements. It is the city's policy to review and upgrade the current standards, where appropriate, to ensure they serve to enhance the site plan review process in the city.

**Goal 14:** To provide for a limited population growth during the time span of the Master Plan. The key factors which should be considered in planning for new development are water supply, water quality, air quality, transportation, storm drainage facilities, open space and the availability of new public facilities, including public schools.

*Policy Statement 14:* The City seeks to encourage the continued development that maintains and incorporates strict environmental performance standards. The intent of the plan is to provide for controlled development and redevelopment that separate incompatible land uses, that can be accommodated while minimize adverse impacts on the community's facilities, ensure that infill development does not adversely impact the environmental character of the area, its physical features, or circulation, and does not add to the physical congestion of neighborhoods. The City's current standards should be reviewed and upgraded, where appropriate, to require provision of open space for all new development projects.

**Goal 15:** To provide for the best possible development of the few remaining vacant tracts, keeping in mind the objectives of maintaining a balance of land uses and diversified residential uses.

*Policy Statement 15:* The City of Clifton recognizes that the protection of existing residential neighborhoods, community appearance and visual environment while looking to provide the best use and development design of the remaining vacant lots is a priority. The Plan's land use recommendations are designed to protect and reinforce the prevailing residential development patterns in the community, maintain and enhance existing areas of ·stability in the community, encourage the proper relationship between existing land uses by promoting a spatial distribution of uses and establishing areas which have their own integrity and uniformity of purpose.

**Goal 16:** To include in the review of development proposals and applications for rezoning a study for the fiscal impact of such proposals on the City of Clifton; and to conduct a cost-revenue study which would analyze the revenue to be produced and the cost to municipal services.

*Policy Statement 16:* The City seeks to encourage development which is sensitive to the community's particular physical characteristics and will serve as an aesthetic and functional improvement to the community. The City recognizes that development pressure and infill development may result in increased demand on community facilities and services, traffic congestion, and other impacts on the community. It is the policy of this plan to enhance the protection of the community resources and maintain the community's quality of life. Within this framework, any new development and redevelopment projects in the City shall identify their fiscal and municipal services impact on the community.

**Goal 17:** To support the overall philosophy of the State Development and Redevelopment Plan (SDRP) as a means of providing growth management on a state-wide basis while retaining the principles of home-rule.

> *Policy Statement 17:* The City maintains that the general intent of the State Development and Redevelopment Plan, to manage growth within the framework of an assessment of needs and infrastructure capabilities, represents a reasonable approach to growth management. The City recognizes that the State Development and Redevelopment Plan's specific planning area designation for Clifton, PA–1, represents a reasonable approach to growth management.
>
> . . . .
>
> *Goal 19:* To provide a variety of recreational uses for all segments of the City's population.[3]
>
> > *Policy Statement 19:* The City seeks to provide the continued improvement of the recreation infrastructure to accommodate local needs; maintain attractive and aesthetically pleasing public open spaces for active and passive recreation opportunities; and establish policies and pursue funding for the creation of new open spaces and recreation facilities in the community. This can be best reinforced by encouraging new development and redevelopment projects to incorporate an open space component, where appropriate; supplementing existing parks with additional equipment and facilities as needed; and exploring purchasing of vacant environmentally constrained properties for open space preservation off Valley Road. . . .

The master plan also noted a significant increase in the number of school age children residing in the City. Between 1990 and 2000, the population of children five to fourteen years old had increased by 40.9 percent. However, in the community facilities element, the master plan contained no recommendations as to how to address the needs of this population through new or improved schools. The master plan noted only two goals with respect to community facilities: (1) "[t]o maintain and improve existing City resources rather than construct or acquire major new facilities"; and (2) "[t]o provide community facilities that will meet local needs and to respond to the varying demands of different demographic groups."

### The Conditions at CHS

Three witnesses testified about the conditions at CHS: Thomas Lyons (Lyons), a member of the community advisory committee, who addressed the long-term facility needs of the City's middle

---

[3] The master plan also noted that the City had significantly less acreage of park land than recommended by the National Park and Recreation Association (approximately 200 acres, whereas between 492 and 787 was recommended).

school and high school; Karen Perkins (Perkins), the BOE's business administrator and secretary; and Lou Fraulo (Fraulo), CHS's supervisor of counseling and guidance, who is responsible for the scheduling of teachers and students. According to these witnesses, CHS has approximately 3400 students, it is the second largest high school in the State, it is significantly overcrowded, and the student population is expected to grow steadily, as it has over the past five-to-ten years.

As to how the overcrowding affects students and faculty, Perkins and Fraulo testified that classes are held in rooms not designated for that purpose. For example, the cafeteria is used for drama, science, Spanish, health, and history classes, and the computer lab room is used for algebra, geometry and journalism classes. Also, CHS utilizes space at the Boys and Girls Club, with students bussed to and from these locations for regular coursework. Certain industrial arts courses have been eliminated from the curriculum so that the rooms used for those courses may be used for other purposes.

Both the advisory committee and the BOE found the property suitable for a school building, notwithstanding its presence in an industrial zone. In this regard, Lyons and Perkins noted that schools in Clifton are "located in every type of neighborhood, whether it's residential or commercial," across the street from lumber yards and chemical facilities, and along heavily trafficked roads, including two schools located very close to Route 46. They also found that the City is "overpopulated," with few options for the placement of new school buildings.

### The Proposed School

The BOE proposed to renovate the vacant warehouse to accommodate 500 students and between thirty and thirty-eight staff members, with twenty-two classrooms, two science rooms, an art room, a music room, a media library area, a computer lab, administrative offices, and a cafeteria and gymnasium. The BOE would renovate the building to insulate the students from any noises arising from the railroad and surrounding businesses.

There would be no weekend use of the proposed school, nor would the gymnasium be available to the public. The normal operating hours would be 7:45 a.m. to 2:30 p.m., although students could arrive in the morning as early as 6:45 a.m. Students would not be permitted to leave the building during their lunch hours or for any other reason. Any students participating in after-school activities would be transported to CHS, since no such activities would occur at the proposed school.

A parking lot would be constructed on the property to accommodate staff and visitors' vehicles. There will be no parking spots for students because ninth grade students are generally too young to drive. There would be a drop-off/pick-up zone for the four buses anticipated as necessary to transport students, which would entail removing some greenery in the front of the property. There also would be a drop-off zone for parents who drive their children to school, and three driveways would separate bus traffic from other vehicles. To protect students' safety during arrival and dismissal hours, staff members would be stationed outside to monitor the driveways, and a staff member would be assigned to open the gate to the easement to ensure that children did not intermingle with any vehicles accessing the easement.

The BOE anticipated that a large percentage of students would walk to the school. For those students, the BOE proposed a site plan and "route to school map," with crossing guards stationed at appropriate intersections, and a crosswalk in front of the school. Both the BOE's traffic expert and Sergeant Richard Stuart of the Clifton Police Department testified that the proposed routes could guide the students safely to school with the crossing guards' assistance.

In terms of the legal criteria for a use variance, the BOE's expert planner, David Hals (Hals), testified that the proposed project would not impair the public safety, health, morals and general welfare of Clifton residents, nor would it cause a substantial detriment to the public good. He also testified that schools are an inherently beneficial use, and that the proposed school was

necessary to address overcrowding at CHS. Therefore, Hals concluded that the proposed school would provide an absolute positive benefit for the community.

Moreover, Hals did not believe that the proposed project would substantially impair the City's master plan. He testified that the City's industrial zone was declining, with a significant number of vacant buildings, including the vacant warehouse on the property. Therefore, redevelopment of the warehouse was consistent with Goal 6 of the master plan. Also, loss of the warehouse from the tax base would result in a financial loss to the City of less than $95,000. Hals also perceived no harm to the M–2 industrial zone in particular.

The expert traffic engineers found that the proposed school would result in only a minor increase in traffic. Hals believed that whatever minimal conflict might exist between the school's use and the neighboring industrial uses could be mitigated with appropriate staffing during pick-up and drop-off times. In this regard, Hals also noted that a school use was much less intense than a permitted industrial use given the short school day, no weekend use of the school, and school holidays and summer vacation.

Finally, Hals noted that although school uses were not permitted in industrial zones, the property was directly across from a residential zone in which schools were a permitted and established use.[4] Therefore, placement of the proposed school on the property would benefit the neighboring residential community.

The BOE's expert real estate appraiser, Jon P. Brody (Brody), opined that development of the property as a school would "not have any detrimental impact on the value of the surrounding industrial properties[,]" and that "it would probably have a positive effect on the residential properties across the street." In his forty years of professional experience, Brody had seen no instance in which a school reduced the values of nearby commercial,

---

[4] Public Elementary School 9 is located further down the street from the property, at Market Street and Brighton Road.

industrial or residential properties, nor had he seen any empirical data supporting such a conclusion. He testified that school buildings usually enhance property values rather than diminish them because they create stability in the community. He also testified that alleviating the overcrowding at CHS would positively effect the City's overall residential and commercial real estate markets.

The BOE's traffic expert, Louis Luglio (Luglio), did a traffic impact study, including traffic counts during peak hours (7:00 a.m. to 9:00 a.m. and 2:00 p.m. to 6:00 p.m.). He opined that the proposed school would "have a negligible effect on traffic conditions in the vicinity of the site," with all nearby intersections operating at acceptable levels of service even during peak hours. Although the northbound approach to the intersection at Brighton Road and Mt. Prospect Avenue might deteriorate from a level of service B to a level of service E during the morning peak hour (8:00 a.m. to 9:00 a.m.), Luglio concluded that this amounted to only a twenty-seven second delay.

Luglio also concluded that the proposed school would generate less traffic than if the property was used for its permitted industrial use. He also noted that the area had a relatively low incidence of motor vehicle accidents, 2.8 crashes per million vehicle miles, compared to the statewide average of 4.8.

The Zoning Board's traffic expert, Brian Intindola (Intindola), also did a traffic impact study, including traffic counts along Brighton Road. He concurred with Luglio's methodology and findings. Intindola testified that "there are not very heavy volumes on Brighton Road as it is now," and that the proposed school was safe and sufficient from a parking and traffic perspective, including the proposed pedestrian routes and the easement.

Finally, all relevant county and state bodies approved the project. The county superintendent of schools recommended that the DOE approve the project, which it did in accordance with the Act. The State Department of Transportation authorized the establishment of the BOE's proposed mid-block crosswalk along Brighton Road.

Further, the Clifton Fire Prevention Bureau was satisfied with the proposed project's safety, subject to some minor design adjustments, which the BOE made. The Clifton Police Department found that there was a continuous, safe pedestrian route available to students walking to and from the property.

### The Objectors

Community members spoke for and against the proposed school. Two objectors presented evidence: Van Ness, owner of property located 400 Brighton Road, just 280 feet from the property, on which it operated a plastics manufacturing business, and intervenor Prologis 230 Brighton, LLC (Prologis), the owner of property located at 230 Brighton Road, immediately adjacent to the property.[5]

Fundamentally, the objectors questioned the need for a high school annex. They cited the quality of Clifton's educational system and the achievements of its students, notwithstanding any overcrowding at CHS. They also noted that the average number of high school students per classroom, as reported by the BOE to the DOE, was comparable to or better than the State average. Fraulo testified, however, that the reported figure was misleading because it reflected the class size average for only one subject (English), and it did not account for the different sections of the subject, which often limit the number of students per class (e.g., limited English, basic skills English, and inclusion students).

The objectors also complained that the proposed school would adversely affect their businesses. Van Ness was most concerned about the increase in traffic, including pedestrian traffic. The Van Ness business operates twenty-four hours a day, five days a week, with shift changes at 7:00 a.m., 3:00 p.m., and 11:00 p.m., and between sixty and sixty-five employees working each shift. It has between twenty-five and thirty tractor trailer operations per day, occurring between 7:00 a.m. and 7:00 p.m., and between 150 and

---

5 Prologis was a party below, but is not participating in this appeal.

175 train deliveries per year. It contended that the truck traffic, which included trucks frequently blocking the sidewalk, would be a danger to the students walking to and from the proposed school.

Prologis contended that the proposed school would adversely affect its ability to lease its property because potential tenants would view negatively the mingling of truck traffic and pedestrian traffic, thereby reducing its property's value. However, the Prologis property was then only partially occupied (130,000 of the 160,000 square feet were vacant), with no prospective tenant. Thus, it was speculative as to how any future tenant might utilize the space.

Van Ness's expert engineer and planner, Hal Simoff (Simoff), and Prologis's expert traffic engineer, Joseph Staigar (Staigar), agreed that the easement on the property created a safety hazard; that the site plan was insufficient for fire truck access; that there would be a conflict between trucks accessing the industrial properties and vehicles accessing the school; that the site plan did not account for sufficient parking spaces, which would cause parking congestion in the neighborhood; that there was a danger to child pedestrians navigating the proposed route to the school and around trucks near the school; and that the proposed school would adversely affect traffic in the area. Simoff claimed that traffic would increase between 4.5 and 5 percent during the peak hour; however neither he nor Staigar did any traffic studies or traffic counts along Brighton Road to support this claim.

The objectors' planning experts, Peter Steck (Steck) and Tom Stearns (Stearns), agreed that a use variance should not be granted. They admitted that a school was an inherently beneficial use but claimed that the property was inappropriate for a school because there would be substantial limitations on the school's operations that would diminish the beneficial nature (e.g., no extracurricular or outside activities), and because there was no way to insulate the students from the surrounding industrial environment.

Steck and Stearns also opined that the BOE could not meet the negative criteria—that the application could be approved without substantial detriment to the public good and without substantial impairment to the master plan and zoning ordinance. They also opined that zoning ordinance prohibited schools in an industrial zone; that the master plan encouraged only industrial uses of the property; that the State Development and Redevelopment Plan did not encourage schools in industrial areas; and that the proposed school would not further the City's public policy, as identified in the master plan, to maintain a balance of land uses, preserve jobs and property values, encourage job growth, limit the environmental impact of any development or redevelopment, and discourage the development of new or expanded public facilities. They further opined that placement of a school in the industrial zone would discourage industrial uses in the area, resulting in substantial impairment of the master plan and zoning ordinance, as well as a violation of sound planning principles that encourage the separation of disparate uses.

Similarly, Prologis's real estate expert, Robert Heffernan (Heffernan), concluded that a school use was inconsistent in an industrial zone. He opined that the noisy, dirty environment was not "conducive to a 'hall of learning,'" that there would be a conflict between the school and industrial uses and a reduction in the value of both the school and industrial properties, and that "[t]here obviously would be concerns for the health, welfare and safety of the students attending such a facility."

Finally, Van Ness presented a medical doctor, Vincent Bonagura (Dr. Bonagura), who raised concerns about the students' exposure to diesel exhaust fumes. The doctor testified that people exposed to such fumes are at risk of developing asthma, or a worsening their asthma. He admitted, however, that he possessed no knowledge about the specifics of the property or its neighborhood.

### The Zoning Board's First Decision

On March 16, 2006, the Zoning Board voted five-to-two to deny the use variance, and adopted a resolution reflecting its decision.

Relying upon what it deemed the "credible" testimony of Simoff, Staigar, Steck, and Stearns, the Zoning Board concluded that the proposed school was an inherently beneficial use but that the BOE had not met the negative criteria. Applying *Sica v. Board of Adjustment of the Township of Wall,* 127 *N.J.* 152, 603 *A.*2d 30 (1992), the Zoning Board found, in relevant part, that:

the *first prong* of the balancing test has been satisfied in that the school is an inherently beneficial use; that the *second prong* requires an identification of what the detrimental effect[s] that will ensue from the grant of the variances are; that Brighton Road is a heavily traveled truck route for the industrial uses; and based upon the testimony aforesaid, it is not safe for the students walking to and from the school and being dropped off at the site; that a school in the middle of an industrial zone will create detriments to the industrial uses; that odor from diesel fuel is negative for the health and safety of the students; that areas on the walking route map are not safe for pedestrians; that noise generated by the trucks from the industrial uses is not conducive for educating students; that the location of the railroad tracks to the rear of the premises creates additional hazards; that the easement for the adjacent property is a hazard; that the conduct of a school at the site would be so limited that the students would be deprived of the education and activities which they are entitled to; that with respect to the *third prong,* the Board has considered the testimony of the experts as well as the submission of conditions by the applicant and finds that whatever conditions are imposed will not reduce the detrimental effects from the location of the school at the site; with respect to the *fourth prong,* the Board has weighed the positive criteria-that is, the benefit-of the school against the negative criteria-which is safety for the students [-] and finds that the grant of the variance would cause substantial detriment to the public good[.]

[ (Emphasis in original).]

The Zoning Board also found that the noxious odor of diesel fuel and heavy truck traffic were "detrimental to the safety of the neighborhood;" that the master plan did not allow schools in an industrial zone; that if it granted the variance, the character of the neighborhood would change to the detriment of both the industrial and residential uses; that "the school [would] be a nuisance to the surrounding industry;" that no conditions it imposed could alleviate the substantial detriments of the proposed project; that the trucks going to and from the adjacent properties would be a danger to students; that parking on sidewalks in the area created a hazard to pedestrians; and that the proposed walking route was not safe.

The Zoning Board also found that the proposed easement on the property did not promote the students' health, safety, and welfare; that truck use of the easement would create a hazard to students and teachers; that the BOE created its own hardship by purchasing the property without first obtaining a use variance; that the "location of the school in the middle of the industrial zone would amount to spot zoning;" that "[it's] obligation is not to validate the election but to uphold the integrity of the [master] plan and zone ordinance;" that "in weighing the positive against the negative [criteria], ... the detriments of the application substantially outweigh the benefits;" and that "[t]he [property] is not particularly suitable for a school because of the aforesaid adjacent industrial uses[.]"

### The First Hearing Before Judge Passero

On April 13, 2006, the BOE filed a complaint in lieu of prerogative writs, contesting the Zoning Board's denial of the use variance. Judge Passero permitted Van Ness and Prologis to intervene in that matter.

In August and September 2006, the parties submitted documents to the judge, supplementing the record. Notably, the BOE submitted portions of the Clifton municipal code addressing the construction and maintenance of sidewalks and the removal of snow and ice, which related to the Zoning Board's concerns about the safety of the walking route to the proposed school. The BOE also submitted the DOE's approval of the project, and documents allegedly showing that in 2004 and 2005, it wrote to the Planning Board and the City's planner, seeking review of the site plan. However, Kirwan claimed that the BOE never applied for the Planning Board's comments on the site plan and planning aspects of the project, as required by N.J.S.A. 40:55D–31a.

Van Ness submitted a letter from the Planning Board to the Zoning Board, which noted planning and zoning concerns about the proposed project. Van Ness also submitted the community advisory committee's findings and recommendations about the location of new school buildings at the property and Latteri Park;

correspondence from the Zoning Board's engineers regarding the proposed school; correspondence from the county superintendent of schools to the DOE raising concerns about the proposed school; articles regarding diesel exhaust, school buses, and children's health and air pollution from truck traffic as it affects lung functioning in children living near motorways; a news article from the Clifton Journal about a proposed bridge at CHS, which would ease hallway congestion; and correspondence between the BOE's attorney and Van Ness, proposing the BOE's purchase of Van Ness's property.

Judge Passero visited the site and heard oral argument on November 1, 2006. In a detailed, twenty-page written opinion, dated November 9, 2006, the judge addressed jurisdiction and concluded that issues of educational adequacy, safety, transportation, and ingress and egress are solely within the DOE's jurisdiction and could not be considered by the Zoning Board. The judge reasoned as follows, in relevant part:

> In this case, we have several competing government entities and must reconcile their relationship to one another with regard to a use variance application for a school. Where a local Board of Adjustment is reviewing a use variance application for a school, the powers of the Zoning Board must be circumscribed in order to give full effect to the New Jersey Legislature's delegation of powers to the state and local school boards.
>
> . . .
>
> [B]y enactment of the EFCFA and subsequent administrative codes, the Legislature invested the state with supremacy with respect to matters concerning the safety, health and adequacy of educational facilities. Specifically, the EFCFA expanded the [DOE's] jurisdiction, previously outlined under *Murnick [v. Bd. of Ed. of the City of Asbury Park,* 235 *N.J.Super.* 225, 561 *A.*2d 1193 (App.Div.), *certif. denied,* 118 *N.J.* 201, 570 *A.*2d 963 (1989)* ], to include many off-site safety issues. The most pertinent regulations, dealing specifically with safety and transportation, include: ... *N.J.S.A.* 18A:39–1.5 ... *N.J.A.C.* 6A:27–1.1 ... *N.J.A.C.* 6A:27–11.4 ... *N.J.A.C.* 6A:26–6.3[.]
>
> . . .
>
> Therefore, the EFCFA and the regulations enacted thereunder delegated to the [DOE] the responsibility to ensure the safety of students with regard to on-site safety, off-site safety, and educational adequacy issues.... Here, since the Legislature gave the [DOE] authority to make determinations regarding the safety and adequacy of educational facilities, the local zoning board must defer to the [DOE's] findings regarding these matters.

....

Therefore, when reading the extensive legislative scheme for education law *in pari materia* with the EFCFA, it is apparent that the Legislature intended to exclude certain issues from the jurisdiction of municipal zoning boards, including safety of students, transportation, walking routes, and ingress and egress of a facility. The Legislature created a procedure in *N.J.S.A.* 40:55D–31 to allow a municipality, through its planning board, to express its concerns about an educational facility. However, in making these recommendations non-binding, the Legislature expressed intent to leave the ultimate decision of educational adequacy and safety with the jurisdiction of the [DOE.]

....

It would create an insurmountable conflict if municipal zoning boards were allowed to deny a use variance for a proposed school based largely on safety and transportation issues which were previously examined by the [DOE] and where the [DOE] previously approved the school facility. Such a holding would render the "educational adequacy" approval process meaningless. Thus, it is clear that a [DOE's] findings pertaining to these matters trump contradictory findings by the Zoning Board. The Zoning Board's jurisdiction is limited to considerations of whether the use variance should be granted or denied premised on limited aspects of the negative criteria as they relate to the impact on the surrounding neighborhood and the negative impact on the zoning ordinance.

The judge also concluded that the Zoning Board erred in finding that the BOE had not met the negative criteria for a use variance, reasoning as follows, in relevant part:

Here, the Zoning Board based its conclusion about the negative criteria on improper considerations. The Zoning Board made several findings that were within the sole jurisdiction of the [DOE]. In both the resolution and extensively throughout the hearings, the Zoning Board examined issues relating to not only the safety of the site, but many off-site safety issues. Specifically, numerous findings in the resolution discuss safety of children at the school site and en route to and from school.

Judge Passero also found that the Zoning Board failed to point to a specific master plan provision with which the proposed school would be inconsistent, but instead, relied solely on the fact schools are not permitted in an industrial zone. The judge further concluded that

[N]o evidence suggests that the Master Plan will be impaired by the existence of the proposed school at the site in question. After a review of the testimony and the Master Plan, this Court finds that the proposed school would be consistent with the intent and purpose of the ... Master Plan. Specifically ... Policy Statement 6 and Goals 6, 9, 14 and 19[ ] and the stated increase in the school age population lend[s] support to this finding.

The judge remanded the matter with these instructions, in relevant part:

Therefore, since a large portion of the Zoning Board's Resolution addresses issues outside of its jurisdiction, the entire *Sica* [*supra*] balancing test must be reexamined in light of these limitations. This Court orders that, on re-hearing, the ... Zoning Board ... must limit its negative criteria inquiry to (1) the impact on the public good, including the variance's effect on the surrounding properties (e.g., impact on property values, damage to the character of the neighborhood, traffic impact [excluding student safety issues]) and (2) whether the variance will substantially impair the intent and purpose of the zone plan and zoning ordinance.

Further, Judge Passero concluded that the Zoning Board erred in other ways, which it must not repeat on remand. First, because the proposed use was inherently beneficial, the hardship issue was irrelevant and the Zoning Board should not consider it. Second, because the use variance did not benefit private interests, and because the proposed school would "benefit the entire community," grant of the variance did not constitute spot zoning, as the Zoning Board had found. Third, the Zoning Board erred in considering the objectors' argument that other sites were available for the construction of a school. The judge noted that schools were not permitted as of right in any zone in the City, and while schools were conditional uses in many zones, the conditions imposed were so stringent that "an eight-acre site would be necessary to accommodate a school of similar size to the proposed annex." The judge determined that this was unrealistic given that the City is a fully developed community.

Finally, Judge Passero concluded that the BOE failed to formally apply to the Planning Board as required by *N.J.S.A.* 40:55D–31, finding that the correspondence between the BOE and the Kirwan was insufficient to meet its statutory obligation, and that it was evident from that correspondence that the plans submitted were not the final plans.

Judge Passero ordered the BOE to make a formal application to the Planning Board pursuant to *N.J.S.A.* 40:55D–31 within ten days of the decision. The judge also ordered that after submission to the Planning Board, the BOE must renew its application with the DOE, and submit the Planning Board's recommendations.

If the DOE approved the proposed project, the Zoning Board would then reconsider the application. No new factfinding hearings could be held before the Zoning Board. The judge retained jurisdiction.

### The Hearing Before the Planning Board

Consistent with Judge Passero's ruling, the BOE submitted an application to the Planning Board. The Planning Board held hearings and considered the Zoning Board's hearing transcripts, exhibits submitted to the Zoning Board, and additional materials the objectors submitted.

Notably, among theses materials was a letter by Kirwan to the Zoning Board, wherein Kirwan remarked that the proposed school was inconsistent with the master plan, in particular, Goals 1 and 15, which encouraged a balance of land uses; Goal 6, which encouraged the re-use, rehabilitation, or reconstruction of existing industrial structures; Goal 14, which encouraged limited population growth and the separation of incompatible land uses; Goal 16, which encouraged development that would serve as an aesthetic and functional improvement to the community and maintain the community's quality of life; and Goal 17, which was to support the overall philosophy of the State Development and Redevelopment Plan (SDRP), and neither the SDRP nor the master plan called for schools to be located in industrial zones.[6]

Kirwan also expressed "very strong concerns" about the "health[,] safety and welfare" of the students who would attend the proposed school. In this regard, he noted "[t]he lack of proper recreation areas, sidewalks or even safe outside sitting areas," and he wondered where the students would have outdoor recreation classes, and whether they had to be bussed back and forth to CHS for classes not available at the proposed school. He also claimed that the proposed parking and traffic circulation

---

[6] The record also contains Kirwan's memo to the Planning Board, wherein he detailed how the proposed school was inconsistent with the master plan.

patterns were inadequate, and noted the BOE's failure to provide the City with materials it had submitted to the DOE.

Finally, Kirwan concluded that:

[T]here are enough questions about safety, proper site design and proper school facility design that the board of education and the Zoning Board of Adjustment should question this project. The office of city planning asks the Clifton Board of Education to review other sites that may be worth condemning for school facilities which are also more closely located to existing school facilities.

The fiscal impact of condemning this proposed school area would far outweigh the benefits of this application combined with the other issues as noted above. The school board should contract with a professional planner to assist them with siting of schools and to follow proper planning principals in any future applications.

Also submitted to the Planning Board were: a document entitled "School Sites: Selection, Development and Utilization," prepared by the DOE, dated 1973, revised, 1986, which sets forth ideal criteria for the siting of new schools; an excerpt from an appraisal report issued to the BOE indicating that the property's highest and best use was as a warehouse distribution or light manufacturing facility; a report about the property, issued to the BOE by environmental consultants; a letter from counsel for the new owner and new occupant of 310 Brighton Road (Mayer's property), which raised concerns about traffic and parking issues, and about the safety of students attending the proposed school, given the easement on the property; a document showing that the new occupant of 310 Brighton Road was an assembler of point-of-purchase displays, which involves the use of hazardous materials; letters between the county superintendent of schools and the DOE, and between the BOE's architect and the county superintendent of schools addressing concerns about the proposed school; a copy of the SDRP, referenced in Kirwan's letter to the Zoning Board; and correspondence from Van Ness's counsel to the Planning Board, urging a conclusion that the proposed project was inconsistent with the master plan.

The Planning Board heard public comments from those opposing the project. Van Ness presented several witnesses. First, consistent with his testimony before the Zoning Board, Steck testified that the proposed school was inconsistent with the master

plan, specifically, the City's stated goals of: encouraging a balance of land uses, including industrial uses, to provide jobs and strengthen the tax base; reusing industrial facilities for non-residential uses that maintain the employment base; providing only the minimum level of community facilities, including schools, discouraging new or expanded community facilities, and discouraging population growth; and maintaining the community's appearance and visual environment.

Steck reasoned that the property was in an industrial zone, intended for industrial use, the master plan did not permit use of the property as a school, and the zoning ordinance reinforced that conclusion by not permitting schools in industrial zones. By permitting a school on the property, the City would discourage other industrial uses from continuing in the area because industrial operations would be hampered by school operations; the two uses were incompatible.

Moreover, Steck stated that the property was undesirable for school use as per the DOE's own standards. It did not allow for outdoor recreational activities; it was surrounded by noise, air pollution, and other disturbing elements; it was too small to accommodate 500 students; it was close to railroad tracks and heavily trafficked roads; and there was no space for landscaping.

Next, Greg Manzione (Manzione), Van Ness's real estate appraiser, who had not testified before the Zoning Board, issued a report and opined that the proposed school would have a detrimental impact on the value of the surrounding industrial properties. Due to increased pedestrian and motor vehicle traffic during the school's arrival and dismissal times, Van Ness would suffer increased material costs in the form of delays to the trucks arriving and departing from its factory, and increased labor costs due to delays to employees' arrival times. In reaching this conclusion, Manzione relied on his observations of pick-up and drop-off times at another Clifton school, and on a published study on the traffic impacts of schools. Manzione stated that the cost increases translated to between a 7.6 and 18.72 percent loss in the

value of the neighborhood properties, and a consequential real estate tax loss to the City of between $266,000 and $455,000 per year.

Finally, William Van Ness testified about drainage if the school was permitted to pave over the front lawn for use as school bus parking. He was concerned that this would exacerbate the flooding Van Ness currently experiences behind its building. Counsel for Van Ness also alleged possible environmental concerns with the property.

The Planning Board adopted a resolution critical of the proposed project. It found that: the proposed school was inconsistent with the master plan, the zoning ordinance, the SDRP, and the DOE's criteria for the selection of school sites; the school would negatively affect the M–2 zone, which was currently thriving, by introducing an incompatible use and leading to increased traffic congestion in the area; the school would eliminate mature trees and pave the entire property, covering more than the permitted lot coverage; and the school would contribute to flooding. The Planning Board also expressed concern about student safety in relation to the pollution from truck traffic, the easement allowing truck traffic on the property, and environmental contamination. The Planning Board encouraged the BOE to "consider rearranging the grade structure of the schools and add onto existing schools before building a new school."

### The DOE's Decision

Kirwan forwarded the Planning Board's resolution and various other materials to the DOE. He also questioned the need for a new school building, citing alleged "under utilization of the school facilities that [exist] [there] today[.]" He recommended that the BOE utilize the property "for administrative purposes only and remodel or [redevelop] their current administration building into a working school." The DOE "considered the objections and concerns embodied in the December 27, 2006 resolution" but found "no conflict" between the master plan and the proposed project.

It re-affirmed its prior approval of the project.[7] The DOE concluded that there was "no reason why the [BOE] may not proceed with the ... project, including any application for a use variance with the ... Zoning Board ... required under *Murnick* [.]."

### The Second Hearing Before Judge Passero

Before the Zoning Board reconsidered the matter, Van Ness and Prologis moved before Judge Passero to supplement the record with the Planning Board record and exhibits and with the DOE's file. The judge ruled that the Zoning Board was to proceed with no new factfinding or hearing, and that it should neither consider nor refer to the Planning Board's record or resolution.

The judge also ruled that the Planning Board record and resolution were not judicially noticeable under *N.J.R.E.* 201(a) because the facts underlying the resolution were in dispute, because pursuant to *N.J.S.A.* 40:55D-31, the resolution was a non-binding list of recommendations, and because the resolution improperly contravened his earlier decision that the proposed school was consistent with the master plan.[8]

The judge further prohibited the Zoning Board from considering any evidence relating to the master plan or to student safety issues (whether on or off-site), site plan issues and the "easement, unless there was competent evidence relating to the easement's potential detrimental effect on surrounding businesses."

### The Second Hearing Before the Zoning Board

The Zoning Board held a hearing on June 7, 2007, and issued a resolution denying the use variance. It found that Brighton Road

---

[7] Van Ness and Prologis appealed from the DOE's decision. Their appeals were dismissed.

[8] The judge also denied a request for the DOE's file due to the lack of information as to what it contained. The judge also permitted time- and topic-limited summations.

is a heavily traveled truck route for the existing industrial uses. Relying upon Simoff and Staigar, it also found that the proposed school would substantially increase traffic. Relying upon Steck and Stearns, and rejecting Hals, it concluded that the proposed school would be detrimental to the industrial uses and to the character of the neighborhood, it would create an environment of friction between the industrial and school uses, and it would create parking problems "which may present a hazard to pedestrians since there are no sidewalks along the full length of Brighton Road." Moreover, the site was not particularly suitable for school use due to the existing industrial uses, and the easement was a detriment.

Relying upon Heffernan, the Zoning Board concluded that the proposed school would make the existing industrial properties less marketable and reduce property values. Despite noting that the City's industrial base is eroding, the Zoning Board nevertheless found that industry should be preserved because it creates jobs and is good for the taxpayers.

Finally, the Zoning Board found that the detriments of the proposed project outweighed the benefits. The state report card,[9] showed that overcrowding at CHS had no negative impact on the educational ability of the students, and no conditions would reduce the detriments of the proposed project.

### The Third Hearing Before Judge Passero

The BOE moved before Judge Passero to reverse the Zoning Board's resolution. Van Ness opposed the motion and filed a cross-motion to modify the judge's prior ruling that the proposed school was consistent with the master plan. Van Ness and Prologis also argued that the DOE's review of the site had not been meaningful, and therefore, the judge should vacate his prior ruling that the transportation and safety issues were not a proper consideration for the Zoning Board.

---

[9] *See N.J.S.A.* 18A:7E-1 to -5,

After oral argument, Judge Passero issued a detailed twenty-two page written opinion, dated August 30, 2007, granting the BOE's motion, denying the cross-motion, reversing and vacating the Zoning Board's denial of the use variance, and granting the variance. The judge affirmed his prior ruling that the proposed school was consistent with the master plan, finding that the Zoning Board never pointed to a specific provision in the master plan with which the proposed school was inconsistent.

Judge Passero also found that he lacked jurisdiction to review the DOE's final decision approving the school, and that an appeal of that decision was to the Appellate Division. The judge also said, "[t]he fact that the DOE and/or the State Board of Education may have failed to comply with its/their statutory obligations does not alter this Court's prior legal holding."

Judge Passero further found that the Zoning Board's denial of the use variance was arbitrary, capricious, and unreasonable. He reasoned that the proposed school was "among the highest of all inherently beneficial uses," and that the Zoning Board improperly minimized its beneficial use by citing the achievements of the City's students notwithstanding the overcrowded CHS.

The judge concluded that the record overwhelming supported the conclusion that CHS is overcrowded, and that currently there are no other viable sites available to alleviate the overcrowding. He noted that schools were not a permitted use in any zone in the City, that the stringent conditions imposed for the development of schools would make it impossible to build a new school in the City without a variance, and that the City's voters had rejected an alternative site (Latteri Park) in a referendum.

The judge also noted that consideration of the adequacy of CHS "is in the province of the DOE, which has been delegated the authority to regulate the adequacy of school facilities." Also, the Zoning Board "fail[ed] to recognize the importance of supplying students with an adequate education as required by the New Jersey Constitution."

Turning to the negative criteria, Judge Passero found that the Zoning Board's resolution contained "numerous irrelevant and unsubstantiated statements." First, the Zoning Board found that the property was not particularly suitable for a school; however, the BOE need not establish particular suitability because the school is an inherently beneficial use.

Second, the record did not support the Zoning Board's conclusion that the proposed school would have an adverse impact on the industrial base and on traffic. With respect to the effect on the industrial base, the judge found that Zoning Board erred by relying upon Heffernan, whose opinion was "a mere hypothesis" and "tantamount to a net opinion." The judge noted that Heffernan

simply stated that there is a strong potential for the Annex to negatively affect the industrial base, but did not state this was certain or provide evidence to support his conclusions. Furthermore, he did not state to what degree the industrial base would be affected—a prediction that could be of considerable concern to the Zoning Board, given that the industrial base is already in decline.

Moreover, the Zoning Board erred by failing to address the effect of the proposed school on the surrounding residential properties, which Hals had addressed.

With respect to the traffic impact of the proposed school, Judge Passero found that the Zoning Board erred by relying on the objectors' traffic experts and rejecting the facially credible and well-supported opinions of the independent experts and the BOE's expert "without explanation or a basis for its conclusion[.]" This especially troubled the judge because the BOE's expert and the Zoning Board's expert, who found that the traffic impact would be negligible, had conducted traffic studies and supported their conclusions with data, whereas the objectors' experts had not done so. The judge also found that the Zoning Board's "conclusory" credibility finding lent itself to an arbitrary ruling and did not allow the court an opportunity to determine whether the finding was reasonable.

Scrutinizing the expert evidence, Judge Passero further found that the Zoning Board improperly relied on Simoff in finding that

Brighton Road was a heavily traveled truck route, since Simoff admitted that he had not conducted a count of tractor trailers driving on the road. The judge also found that the Zoning Board erred by relying upon Simoff in finding that the proposed school would increase traffic by 4.5 to 5 percent. The judge said that the Zoning Board's obligation was to compare the traffic impact of a proposed non-conforming use to traffic generated from the existing site if used for an intended purpose, "not, as in this case, when the existing building is vacant." The judge also noted that Intindola had performed the proper analysis and "concluded that the LOS [loss of service] in the surrounding areas would be the same whether the site was used as an Annex [to CHS] or as an industrial use." Also, all experts agreed that the proposed school would increase traffic only during its limited hours of use. The judge, thus, concluded that "the weight of the evidence shows that the traffic impact of the proposed [school] will be negligible, especially when compared to the traffic impact of a fully operational industrial warehouse."

Summing up the negative criteria, Judge Passero found "that the negative impact expected from the proposed use, if detrimental at all, would not rise to the statutory degree of constituting a 'substantial detriment to the public good.'" (quoting *N.J.S.A.* 40:55D-70(d)). Also, the Zoning Board erred when it "summarily dismissed all possible conditions and failed to discuss why it believes no condition could reduce the negative impacts of the proposed [school]." Contrary to the Zoning Board's ruling, the benefits of the proposed school outweighed the detriments.

By order dated August 30, 2007, the judge denied Van Ness's request for a stay of construction. This appeal followed.

I.

We first address the parties' contentions relating to Judge Passero's remand to the Planning Board. *N.J.S.A.* 40:55D-31a, provides, in relevant part, that:

Whenever the planning board shall have adopted any portion of the master plan, the governing body or other public agency having jurisdiction over the subject matter, before taking action necessitating the expenditure of any public funds, incidental to the location, character or extent of such project, shall refer the action involving such specific project to the planning board for review and recommendation in conjunction with such master plan and shall not act thereon, without such recommendation or until 45 days have elapsed after such reference without receiving such recommendation. This requirement shall apply to action by a ... school board or other similar public agency, State, county or municipal.....

Van Ness contends that Judge Passero erred by remanding the matter to the Planning Board. Instead, the judge should have affirmed the Zoning Board's denial of the variance because the BOE did not first apply to the Planning Board as required by *N.J.S.A.* 40:55D–31a. The BOE contends that the remand to the Planning Board was unnecessary because it complied with the requirements of *N.J.S.A.* 40:55D–31a, and because Judge Passero was bound by the DOE's finding that it complied with the statute. Both contentions are incorrect under the facts of this case.

Our review of a trial judge's findings is a limited one. *Fagliarone v. Twp. of N. Bergen,* 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div), *certif. denied,* 40 *N.J.* 221, 191 *A.*2d 61 (1963). We will not " 'engage in an independent assessment of the evidence as if [we] were the court of first instance,' " *N.J. Div. of Youth & Family Servs. v. Z.P.R.,* 351 *N.J.Super.* 427, 433, 798 *A.*2d 673 (App.Div.2002) (quoting *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999)), and will reverse only if we are convinced the trial judge's factual findings and legal conclusions "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." *Fagliarone, supra,* 78 *N.J.Super.* at 155, 188 *A.*2d 43. However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference[ ]" and is subject to de novo review. *Manalapan Realty v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) (citations omitted); *see also Finderne Mgt. Co. v. Barrett,* 402 *N.J.Super.* 546, 573, 955 *A.*2d 940 (App.Div.2008).

The issue of the statutory interpretation and application of *N.J.S.A.* 40:55D–31a in this case raises a question of law that we review de novo. Therefore, we are not bound by the ruling of either Judge Passero or the DOE. In this regard, it is also significant that the DOE has no special role in interpreting the statutory language of *N.J.S.A.* 40:55D–31, which is part of the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –163, not part of any education law statute under which the DOE has authority. *See Parsippany–Troy Hills Educ. Ass'n v. Bd. of Educ. of Twp. of Parsippany–Troy Hills,* 188 *N.J.Super.* 161, 165–66, 457 *A.*2d 15 (App.Div.), *certif. denied,* 94 *N.J.* 527, 468 *A.*2d 182 (1983).

 The education law statute applicable here, and the applicable administrative regulations, require the submission of school facilities projects for review by a local planning board only where referral to the planning board is required under *N.J.S.A.* 40:55D–31. *See, e.g., N.J.S.A.* 18A:18A–16; *N.J.A.C.* 6A:26–3.2(c); *N.J.A.C.* 6A:26–5.3(b)(4); *N.J.A.C.* 6A:26–7.1(b)(4)(i). Such a referral allows a planning board to suggest "steps [which the applicant] may take to enable the designers of the proposed project to be consistent with, to whatever extent possible," the municipality's master plan. *Ocean County Util. Auth. v. Planning Bd. of Twp. of Berkeley,* 221 *N.J.Super.* 621, 631, 535 *A.*2d 550 (Law Div.1987), *aff'd,* 223 *N.J.Super.* 461, 538 *A.*2d 1307 (App.Div.1988). However, even if such a referral under *N.J.S.A.* 40:55D–31 is required, a planning board's recommendations are non-binding. *Ibid. See also Murnick,* 235 *N.J.Super.* at 229–30, 561 *A.*2d 1193. Nevertheless, the State agency should consider the planning board's suggestions, and "if not in conflict with the State legislative scheme, or otherwise unreasonable, should be complied with or accommodated." *Ocean County Util., supra,* 223 *N.J.Super.* at 463, 538 *A.*2d 1307.

 *N.J.S.A.* 40:55D–31 does not apply to all capital improvement projects, however. We recently held that the requirement of a planning board referral under the statute "only applies if the governing body has authorized the planning board 'to prepare a

program of municipal capital improvement projects' in accordance with *N.J.S.A.* 40:55D–29.' " *Mount Laurel Twp. v. Mipro Homes, L.L.C.,* 379 *N.J.Super.* 358, 370, 878 *A.*2d 38 (App.Div.2005), *aff'd,* 188 *N.J.* 531, 910 *A.*2d 617 (2006), *cert. denied,* —— *U.S.* ——, 128 *S.Ct.* 46, 169 *L.Ed.*2d 242 (2007). *N.J.S.A.* 40:55D–29 provides, in pertinent part:

> a. *The governing body may authorize the planning board from time to time to prepare a program of municipal capital improvement projects projected over a term of at least 6 years, and amendments thereto.* Such program may encompass major projects being currently undertaken or future projects to be undertaken, with federal, State, county and other public funds or under federal, State or county supervision. . . . The program shall classify projects in regard to the urgency and need for realization, and shall recommend a time sequence for their implementation. The program may also contain the estimated cost of each project and indicate probable operating and maintenance costs and probable revenues, if any, as well as existing sources of funds or the need for additional sources of funds for the implementation and operation of each project. *The program shall, as far as possible, be based on existing information in the possession of the departments and agencies of the municipality and shall take into account public facility needs indicated by the prospective development shown in the master plan of the municipality or as permitted by other municipal land use controls.*
>
> *In preparing the program, the planning board shall confer,* in a manner deemed appropriate by the board, *with* the mayor, the chief fiscal officer, other municipal officials and agencies, and *the school board or boards.*
>
> . . . .
>
> b. In addition to any of the requirements in subsection a. of this section, whenever the planning board is authorized and directed to prepare a capital improvements program, every municipal department, authority or agency shall, upon request of the planning board, transmit to said board a statement of all capital projects proposed to be undertaken by such municipal department, authority or agency, during the term of the program, for study, advice and recommendation by the planning board[.]
>
> [ (Emphasis added).]

Here, there is no evidence that the Clifton governing body delegated authority to the Planning Board to prepare a program of municipal capital improvement projects under *N.J.S.A.* 40:55D–29, including the proposed school. In fact, the record suggests otherwise. For example, the master plan notes an increase in the City's student-age population; however, it contains no provision directing the Planning Board to address that population's needs through a capital improvement program, such as construction of

new schools or additions or renovations to existing schools. Presumable, if the governing body had directed the Planning Board to prepare such a program, the master plan would have included such a provision, or at least some reference to the Planning Board's efforts in completing that task.

Similarly, if the governing body had delegated authority to the Planning Board, there would have been no need for the community advisory committee, which was established specifically to evaluate options to alleviate the overcrowding at CHS and to locate appropriate sites for a new school.

Because there is no evidence that the governing body delegated authority to the Planning Board to prepare a program of municipal capital improvement projects under *N.J.S.A.* 40:55D–29, the BOE was not required to present the project to the Planning Board for its review and recommendation pursuant to *N.J.S.A.* 40:55D–31. *Mount Laurel, supra,* 379 *N.J.Super.* at 370–71, 878 *A.*2d 38. Although the parties did not address this issue, it is dispositive. Accordingly, we conclude that the remand to the Planning Board was improper.

█ Assuming that the governing body had delegated such authority to the Planning Board, we discern no error in Judge Passero's finding that the BOE did not comply with *N.J.S.A.* 40:55D–31. We agree that the BOE's correspondence with the City planner was insufficient to fulfill its obligation under the statute. Kirwan was not a Planning Board member and, thus, not authorized to act on the Planning Board's behalf under *N.J.S.A.* 40:55D–31. There is no indication of the Planning Board's awareness the correspondence. Also, Kirwan's letter to the BOE requested answers to certain questions, indicating that the letter was not a final recommendation, and the BOE indicated that it would make a formal application at a later date. Thus, Kirwan could not have believed that his response to the BOE's correspondence was a final recommendation.

[6] We disagree that the BOE's failure to submit a formal application to the Planning Board should have resulted in an automatic affirmance of the Zoning Board's denial of the variance. We emphasize that the Zoning Board held nineteen hearings between August 17, 2005, and April 19, 2006, the matter was well-publicized, and the City planner was aware of what was occurring. Accordingly, Judge Passero's ordering the BOE to make a formal application, instead of affirming the denial of the variance, was an appropriate remedy under the circumstances of this case.

Again, assuming *N.J.S.A.* 40:55D-31 applies, we now address Van Ness's contentions that the BOE violated the statute by expending funds on the project before submitting it to the Planning Board for review and recommendation, and that Judge Passero erred by prohibiting the Zoning Board from considering the Planning Board record and resolution.

Our Supreme Court's generous interpretation of an earlier version of *N.J.S.A.* 40:55D-31 is more consistent with the reality of school construction projects under the present state of the law. In *Citizens to Protect Public Funds v. Board of Educ. of Township of Parsippany-Troy Hills,* 13 *N.J.* 172, 177-80, 98 *A.*2d 673 (1953), the Court held that before submitting its plans to the planning board, a board of education could hold a referendum on a school construction project, and print booklets to inform citizens about the project. The Court reasoned that "[l]ogically, indeed, there could be no purpose in submitting the proposed improvement to the planning board for its consideration until the procedures for authorizing the financing of the improvement were completed and the ability to pay for the improvements reasonably established." *Id.* at 178, 98 *A.*2d 673. Also, the board of education's implied power "to formulate the construction program in the first instance" gave it the authority to expend funds in order to educate the public, without advocacy, about its plans. *Id.* at 180-82, 98 *A.*2d 673.

Based on the Court's holding and reasoning in *Citizens,* and given the practicalities involved in constructing a school under

existing law, which requires the expenditure of public funds to first develop a plan to present to the DOE, and the planning board, if required under *N.J.S.A.* 40:55D–31, we reject Van Ness's contention that the BOE improperly expended public funds.

■ We also reject Van Ness's contention that Judge Passero erred by prohibiting the Zoning Board from considering the Planning Board record and resolution, and by failing to take judicial notice of that information. Although not raised in the typical context of a trial, these contentions essentially involve an evidentiary ruling.

■ "As a general rule, admission or exclusion of proffered evidence is within the discretion of the trial judge whose ruling is not disturbed unless there is a clear abuse of discretion." *Dinter v. Sears, Roebuck & Co.,* 252 *N.J.Super.* 84, 92, 599 *A.*2d 528 (App.Div.1991); *see also Purdy v. Nationwide Mutual Insurance Co.,* 184 *N.J.Super.* 123, 130, 445 *A.*2d 424 (App.Div.1982). We grant substantial deference to the trial judge's discretion on evidentiary rulings. *Benevenga v. Digregorio,* 325 *N.J.Super.* 27, 32, 737 *A.*2d 696 (App.Div.1999), *certif. denied,* 163 *N.J.* 79, 747 *A.*2d 287 (2000). Reversal is unwarranted unless the trial judge's ruling was "so wide of the mark that a manifest denial of justice resulted." *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982). Applying these standards, we continue our analysis.

■ The rules of evidence are not binding on a zoning board. *N.J.S.A.* 40:55D–10(e). However, evidentiary concepts are still pertinent, and it has been held that zoning boards "may take judicial notice of such matters as are so notorious as not to be the subject of reasonable dispute." *Reinauer Realty Corp. v. Nucera,* 59 *N.J.Super.* 189, 202, 157 *A.*2d 524 (App.Div.), *certif. denied,* 32 *N.J.* 347, 160 *A.*2d 845 (1960).

The evidentiary rule on judicial notice, *N.J.R.E.* 201 provides as follows, in relevant part:

(a) Notice of Law. Law which may be judicially noticed includes ... ordinances, regulations and determinations of all governmental subdivisions and agencies ...

(b) Notice of Facts. Facts which may be judicially noticed include:

(1) such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute,

(2) such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute,

(3) specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned, and

(4) records of the court in which the action is pending and of any other court of this state or federal court sitting for this state.

Van Ness cites no authority permitting a zoning board to consider the testimony or exhibits admitted before a planning board. However, two pertinent decisions address the admissibility of a planning board's resolution in a subsequent zoning board proceeding. In *Fobe Associates v. Mayor and Council and Bd. of Adj. of the Borough of Demarest,* 74 *N.J.* 519, 530–31, 379 *A.*2d 31 (1977), a zoning board had admitted into evidence a planning board resolution opposing a use variance application. The resolution contained the planning board's opinion that

the variance would be substantially detrimental to the public good and to the intent and purpose of the master plan and ordinance. It would interfere with the planned population of the borough and thwart orderly growth; it would violate the neighborhood scheme to the detriment of nearby home owners who had relied on the ordinance and master plan; it would effectively make it impossible to prevent multi-family developments on other vacant lots in the borough.

[*Ibid.*]

The Court held that "[s]o long as reasonable notice of the submission of such materials is afforded an opponent, with an opportunity to meet any adverse impact therefrom, there can be no fair complaint concerning the use of such aids to informed adjudication." *Id.* at 542, 379 *A.*2d 31. Applying this holding to the facts, the Court found no error, noting that the plaintiff was aware of the resolution's existence, it was not deprived of a fair opportunity to respond to the resolution's substance, and it did not dispute the accuracy of the facts stated in the resolution. *Id.* at 542–43, 379 *A.*2d 31.

Similarly, in *Charlie Brown of Chatham, Inc. v. Bd. of Adj. for Twp. of Chatham,* 202 *N.J.Super.* 312, 325–27, 495 *A.*2d 119 (App.Div.1985), we found no error in the zoning board's consideration of a planning board's resolution. In so ruling, we noted that the planning board's resolution was referred to in other documents in the zoning board's record; in fact, the planning board's ruling on accessory use formed the basis for the application to the zoning board, and the plaintiff was bound by that ruling under the doctrines of res judicata and collateral estoppel. *Ibid.* Moreover, as in *Fobe,* the plaintiff in *Charlie Brown* was aware of the planning board's resolution before its admission into evidence, and it did not dispute the accuracy of any facts stated therein. *Id.* at 326–27, 495 *A.*2d 119. Finally, we permitted judicial notice of the resolution under the then-extant evidentiary rule on judicial notice. *Id.* at 326, 495 *A.*2d 119.

Based upon the above-cited law, we perceive no error in Judge Passero's ruling that the Zoning Board could not considered the Planning Board record and resolution, and in his refusal to take judicial notice of that information. The facts contained in the Planning Board's record and resolution were not "so notorious as not to be the subject of reasonable dispute," *Reinauer, supra,* 59 *N.J.Super.* at 202, 157 *A.*2d 524, and they do not fall within the scope of facts judicially noticeable under *N.J.R.E.* 201(b).

More importantly, the sole purpose of the Planning Board's hearing was to consider whether the proposed school was consistent with the master plan. *See N.J.S.A.* 40:55D–31a. The hearing was not an opportunity for the objectors to supplement the record (e.g., through the testimony of Van Ness's real estate expert, Manzione, when Van Ness did not present such an expert at the Zoning Board hearings). Nor was it license for the Planning Board to consider issues not relevant to its consideration under *N.J.S.A.* 40:55D–31, for example, issues that are within the sole jurisdiction of the DOE concerning school construction (e.g., concerns about the safety of students who would attend the school,

including environmental issues, the suitability of the property for school use, and site plan issues).

Also, although Steck and Kirwan provided evidence at the Planning Board hearing about the proposed school's alleged inconsistency with the master plan, that evidence was duplicative of evidence already presented to the Zoning Board. Therefore, supplementing the Zoning Board's record to include this evidence would have achieved nothing.

Regarding the admissibility of the Planning Board's resolution, Judge Passero's distinction of *Fobe* and *Charlie Brown* was correct. In those cases, we held a planning board's resolution admissible in a zoning board proceeding. However, Judge Passero correctly noted that the plaintiffs in *Fobe* and *Charlie Brown* did not contest the accuracy of any facts contained in the planning board's resolution. Here, the BOE contests all of the facts contained in the resolution. Second, unlike in *Fobe* and *Charlie Brown,* the Planning Board's finding in the resolution that the proposed school was inconsistent with the City's master plan directly conflicted with the Judge Passero's ruling to the contrary.

Finally, it is significant that the Planning Board's resolution contains facts and conclusions outside its limited jurisdiction under *N.J.S.A.* 40:55D–31, as noted by Judge Passero. For example, the Planning Board issued conclusions and recommendations on such issues as the site's suitability for school use, site plan issues, and the safety of students, all of which are within the DOE's sole jurisdiction. The Zoning Board's consideration of these conclusions, therefore, was improper.

## II.

■ Van Ness next contends that Judge Passero erred by holding that the proposed school was consistent with the master plan, contrary to the Zoning Board's conclusion. We disagree.

■ In reviewing a planning board's decision, we use the same standard used by the trial court. *Cohen v. Bd. of Adj. of the*

*Borough of Rumson,* 396 *N.J.Super.* 608, 614–15, 935 *A.*2d 842 (App.Div.2007) (citing *N.Y. SMSA, L.P. v. Bd. of Adj., Twp. of Weehawken,* 370 *N.J.Super.* 319, 331, 851 *A.*2d 110 (App.Div. 2004)); *Pullen v. Twp. of S. Plainfield Planning Bd.,* 291 *N.J.Super.* 1, 6, 676 *A.*2d 1095 (App.Div.1996). Like the trial court, our review of a planning board's decision is limited. *Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adj.,* 152 *N.J.* 309, 327, 704 *A.*2d 1271 (1998). We give deference to a planning board's decision and reverse only if its action was arbitrary, capricious, or unreasonable. *Jock v. Bd. of Adj.,* 184 *N.J.* 562, 597, 878 *A.*2d 785 (2005); *Zilinsky v. Zoning Bd. of Adj. of Verona,* 105 *N.J.* 363, 367, 521 *A.*2d 841 (1987); *Kramer v. Bd. of Adjustment,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965); *Cohen, supra,* 396 *N.J.Super.* at 620, 935 *A.*2d 842. We give even greater deference to a planning board's decision to deny a variance in preservation of a zoning plan than a decision to grant a variance. *Nextel of N.Y., Inc. v. Borough of Englewood Cliffs Bd. of Adj.,* 361 *N.J.Super.* 22, 38, 824 *A.*2d 198 (App.Div.2003). Where a planning board has denied a variance, the applicant must prove that the evidence before the board was "'overwhelmingly in favor of the applicant.'" *Ibid. See also Med. Realty Assocs. v. Bd. of Adj. of City of Summit,* 228 *N.J.Super.* 226, 233, 549 *A.*2d 469 (App.Div.1988).

 Zoning boards may choose which witnesses, including expert witnesses, to believe. *El Shaer v. Planning Bd. of Twp. of Lawrence,* 249 *N.J.Super.* 323, 329, 592 *A.*2d 565 (App.Div.), *certif. denied,* 127 *N.J.* 546, 606 *A.*2d 360 (1991); *Hawrylo v. Bd. of Adj., Harding Twp.,* 249 *N.J.Super.* 568, 579, 592 *A.*2d 1236 (App.Div. 1991); *Allen v. Hopewell Twp. Zoning Bd. of Adj.,* 227 *N.J.Super.* 574, 581, 548 *A.*2d 220 (App.Div.), *certif. denied,* 113 *N.J.* 655, 552 *A.*2d 177 (1988). However, to be binding on appeal, that choice must be reasonably made. *Kramer, supra,* 45 *N.J.* at 288, 212 *A.*2d 153; *Nextel of N.Y., supra,* 361 *N.J.Super.* at 41, 824 *A.*2d 198; *Ocean County Cellular Tel. Co. v. Twp. of Lakewood Bd. of Adj.,* 352 *N.J.Super.* 514, 537, 800 *A.*2d 891 (App.Div.), *certif. denied,* 175 *N.J.* 75, 812 *A.*2d 1108 (2002). In addition, the choice

must be explained, particularly where the board rejects the testimony of facially reasonable witnesses. *N.Y. SMSA, L.P., supra,* 370 *N.J.Super.* at 338, 340, 851 *A.2d* 110. The board cannot rely upon unsubstantiated allegations, nor can it rely upon net opinions that are unsupported by any studies or data. *Cell S. of N.J. v. Zoning Bd. of Adj.,* 172 *N.J.* 75, 88, 796 *A.2d* 247 (2002); *New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adj.,* 160 *N.J.* 1, 16, 733 *A.2d* 442 (1999); *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.2d* 1150 (1981).

To obtain a variance pursuant to *N.J.S.A.* 40:55D–70, such as the variance sought here, the applicant must satisfy the positive and negative criteria embodied in *N.J.S.A.* 40:55D–70c(1) and (2). *Cell S. of N.J., supra,* 172 *N.J.* at 82, 796 *A.2d* 247. There is no dispute that the BOE satisfied the positive criteria. Thus, the Zoning Board's only function was to determine whether the BOE satisfied the negative criteria, that is, whether the variance sought could be granted without "substantial detriment to the public good," and without "substantially impair[ing] the intent and purpose of the master plan and zoning ordinance." *New Brunswick Cellular Tel. Co., supra,* 160 *N.J.* at 6, 733 *A.2d* 442; *Kaufmann v. Planning Bd. for Warren,* 110 *N.J.* 551, 553, 542 *A.2d* 457 (1988); *Medici v. BPR Co.,* 107 *N.J.* 1, 21–22, 526 *A.2d* 109 (1987).

In its resolution, dated March 16, 2006, the Zoning Board concluded that the BOE had not met the negative criteria because the master plan did not permit a school in an industrial zone. It also found that "the proposed school in an industrial zone will not be in accord with the intent and purpose of the master plan"

In his written opinion, dated November 8, 2006, Judge Passero rejected the Zoning Board's conclusion, which he found conclusory. After reviewing the relevant testimony from the Zoning Board hearings and the master plan, the judge concluded that the proposed school would be consistent with the master plan's intent and purpose, specifically, Goal 6 and Policy Statement 6 (to encourage the re-use, rehabilitation, or reconstruction of vacant industrial structures for non-residential uses), Goal 9 (to provide

adequate community facilities, including schools, to serve the City's residents), Goal 14 (to provide for limited population growth during the time span of the master plan, and in considering new development, factoring in open space and the availability of new public facilities, including public schools), and Goal 19 (to provide a variety of recreational uses for all segments of the City's population).

Based upon our careful review of the record, we are satisfied that Judge Passero properly found the proposed school would be consistent with the intent and purpose of the master plan. The evidence shows clearly that the proposed school meets Goals 6, 9, 14, and 19 of the master plan, and it addresses the master plan's concern about the significant increase in the number of school age children residing in the City.

### III.

■■■ Van Ness contends that Judge Passero erred in holding that the EFCFA gave the DOE jurisdiction over off-site safety issues. It argues that the DOE's jurisdiction is limited to the safety of educational facilities, which are defined as structures used for academic purposes. Therefore, the judge erred by not allowing the Zoning Board to consider off-site safety issues, such as the safety of students arriving at and departing from the proposed school. We disagree.

Judge Passero's holding is a fair interpretation and application of the governing law in this State. The State constitution mandates that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § 4, ¶ 1. The constitution further provides that "[t]he Legislature may, within reasonable limitations as to distance to be prescribed, provide for the transportation of children within the ages of five to eighteen years inclusive to and from any school." *N.J. Const.* art. VIII, § 4, ¶ 3.

The Legislature has delegated its responsibility for providing a thorough and efficient public school system, which includes providing adequate physical facilities and necessary transportation, to the DOE, headed by the State Board of Education. *In re Application of Bd. of Educ. of Upper Freehold Reg'l Sch. Dist.*, 86 *N.J.* 265, 272–73, 275, 278, 430 *A.2d* 905 (1981). County superintendents of schools and local boards of education have also been delegated certain responsibilities. *Id.* at 273, 430 *A.2d* 905. *Accord Robinson v. Cahill*, 62 *N.J.* 473, 509 n. 9, 303 *A.2d* 273 (1973). *See also N.J.S.A.* 18A:4–1 to –41; *N.J.S.A.* 18A:7–1 to –16; *N.J.S.A.* 18A:10–1 to 18A:12–34.

A limited number of cases have considered the interaction between local boards of education and local zoning and planning boards, all of which were decided before the adoption of the EFCFA in 2000. In 1964, the Court considered a town's zoning power with respect to schools. *Roman Catholic Diocese v. Borough of Ho–Ho–Kus*, 42 *N.J.* 556, 559, 202 *A.2d* 161 (1964). It noted that a local school board is "the State's agent to discharge the State's constitutional duty to provide for a system of free public schools," and thus was "a distinct entity essentially independent of the local governing body[.]" *Id.* at 561, 202 *A.2d* 161. Also, "with respect to the sufficiency of the school plant itself the Legislature has both vested responsibility in a state agency and expressly barred the municipality." *Ibid.* Nevertheless, no constitutional or legislative mandate exempted schools from zoning; therefore, schools were subject to zoning. *Id.* at 560–63, 202 *A.2d* 161. *Accord Twp. Comm. of Denville v. Bd. of Educ. of Vocational Sch. in County of Morris*, 59 *N.J.* 143, 146–51, 279 *A.2d* 842 (1971). *Cf., Marlboro Twp. v. Freehold Reg'l High Sch. Dist.*, 195 *N.J.Super.* 245, 247–51, 478 *A.2d* 1228 (App.Div.1984) (municipality not preempted by state education law from enforcing its police power with respect to schools; it could order removal of speed bump on school driveway).

In 1989, in *Murnick, supra*, 235 *N.J.Super.* at 229, 561 *A.2d* 1193, we read the governing land use and education statutes "to

spell out a pattern of consistent, non-conflicting roles for all of the involved governmental entities—the local planning board, the local school board, the [DOE] and the State Board of Education—in the construction or improvement of public school facilities." In light of those statutes, we held that local school boards were bound only by the use restrictions of municipal zoning ordinances, not by regulations regarding "such matters as height, setbacks, parking and site plan approval." *Id.* at 227, 561 *A.2d* 1193. *Accord Carine v. Cliffside Park Bd. of Educ.,* 161 *N.J.Super.* 137, 138–40, 390 *A.2d* 1228 (Law Div.1978).

▮ In 2000, the Legislature adopted the EFCFA, the purpose of which is to ensure the quality, utility, and safety of "educational facilities" so that the Legislature meets its constitutional obligation to maintain and support a thorough and efficient system of free public schools. *N.J.S.A.* 18A:7G–2. The Legislature further provided that the EFCFA "shall be construed liberally to effectuate the legislative intent and purposes of the act." *N.J.S.A.* 18A:7G–29.

The statute does not define "educational facilities." *N.J.S.A.* 18A:7G–3. However, it defines "school facility" as "any structure, building or facility used wholly or in part for educational purposes by a district and facilities that physically support such structures, buildings and facilities, such as district wastewater treatment facilities, power generating facilities, and steam generating facilities, but shall exclude other facilities." *N.J.S.A.* 18A:7G–3. The statute also defines "other facilities" as "athletic stadiums, swimming pools, any associated structures or related equipment tied to such facilities including, but not limited to, grandstands and night field lights, greenhouses, facilities used for non-instructional or non-educational purposes, and any structure, building, or facility used solely for school administration." *N.J.S.A.* 18A:7G–3.

Under the EFCFA, and education law in general, the DOE is highly involved in school construction projects in the State. The Act "established a comprehensive mechanism for the planning, financing, and construction of certain school projects," and it "sets

out a detailed process for the proposal, review, and approval of school construction projects." *East Orange Bd. of Educ. v. N.J. Schools Construction Corp.*, 405 *N.J.Super.* 132, 136, 138, 963 *A.2d* 865 (App.Div.2009). The DOE also has adopted regulations pursuant to the Act, *N.J.S.A.* 18A:7G–26, which elaborate upon the statutory requirements. *N.J.A.C.* 6A:26–1.1 to –18.6.

Each school district must submit to the DOE, for review and approval, a long-range facilities plan addressing the district's school facilities needs and its plans to meet those needs in the following five years. *N.J.S.A.* 18A:7G–4; *N.J.A.C.* 6A:26–2.1 to – 2.3. The DOE must review and approve the final plans and specifications for any proposed school construction. *N.J.S.A.* 18A:18A–16; *N.J.S.A.* 18A:18A–49; *N.J.S.A.* 18A:7G–5; *N.J.A.C.* 6A:26–3.1 to –3.3; *N.J.A.C.* 6A:26–5.1 to –5.6.

Included in the DOE's consideration are: the location of the proposed school in relation to highways, *N.J.S.A.* 18A:7G–5.1; walkways, roadways, access roads, buffer and set back zones, parking areas, easements, and environmentally sensitive areas, *N.J.A.C.* 6A:26–5.3(a)(5); and consistency with educational facility planning standards, *N.J.A.C.* 6A:26–6.3. The DOE's safety considerations are not limited to school and recreational facilities; they also incorporate the movement of students to and from school either by walking routes or authorized transportation. *N.J.S.A.* 18A:20–20; *N.J.S.A.* 18A:22–8.6; *N.J.S.A.* 18A:25–2; *N.J.S.A.* 18A:33–1 to –2; *N.J.S.A.* 18A:39–1 to –30. Indeed, there is a whole section of the code addressing student transportation. *N.J.S.A.* 18A:39–1 to –30; *N.J.A.C.* 6A:27–1.1 to –13.5. Also, the statute includes a provision for assessing walking routes:

a. A school district that provides courtesy busing services shall adopt a policy regarding the transportation of students who must walk to and from school along hazardous routes. The policy shall include a list of hazardous routes in the district requiring the courtesy busing of students and the criteria used in designating the hazardous routes. In adopting its policy, the school district may consider, but shall not be limited to, the following criteria:

(1) Population density;

(2) Traffic volume;

(3) Average vehicle velocity;

(4) Existence or absence of sufficient sidewalk space;

(5) Roads and highways that are winding or have blind curves;

(6) Roads and highways with steep inclines and declines;

(7) Drop-offs that are in close proximity to a sidewalk;

(8) Bridges or overpasses that must be crossed to reach the school;

(9) Train tracks or trestles that must be crossed to reach the school; and

(10) Busy roads or highways that must be crossed to reach the school.

b. A school district shall work in conjunction with municipal officials in determining the criteria necessary for the designation of a hazardous route.

[*N.J.S.A.* 18A:39–1.5.]

*See also N.J.A.C.* 6A:27–11.4 (district boards of education shall provide safety education program to students, including pedestrian safety and rules for riding school bus); *N.J.A.C.* 6A:27–13.3 (requiring regular reviews of student transportation operations).

■ The issue presented here is one of state preemption: whether state education law, and in particular the EFCFA, prevents a municipal zoning board from considering on-site safety issues with respect to school construction, and off-site safety issues to the extent they relate to student transportation to and from school, and from issuing rulings on such issues that are contrary to the DOE's rulings.

Preemption has generally been defined as "a judicially created principle based on the proposition that a municipality, which is an agent of the State, cannot act contrary to the State." *Overlook Terrace Management Corp. v. Rent Control Bd. of W. New York*, 71 *N.J.* 451, 461, 366 *A.2d* 321 (1976).

Although it is a judicially-devised standard, the doctrine of state preemption turns upon the intention of the Legislature. If the court determines that the Legislature intended "its own actions, whether it exhausts the field or touches only part of it, to be exclusive," then it will conclude that the State has preempted the field, thereby barring any municipal legislation. *State v. Ulesky*, 54 *N.J.* 26, 29, 252 *A.2d* 720 (1969); *see Summer v. Teaneck*, 53 *N.J.* 548, 555, 251 *A.2d* 761 (1969).

In *Overlook Terrace Management Corp., supra*, [71 *N.J.* at 461–62, 366 *A.2d* 321,] the Court outlined five factors to be considered in preemption analysis:

1. Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is, does the ordinance forbid what the Legislature has permitted?

2. Was the state law intended expressly or impliedly to be exclusive in the field?

3. Does the subject matter reflect a need for uniformity?

> 4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?
>
> 5. Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature?
>
> [*Mack Paramus Co. v. Mayor & Council of Borough of Paramus*, 103 *N.J.* 564, 573, 511 *A.*2d 1179 (1986).]

State education law regulating the planning, design, and construction of school facilities is pervasive and comprehensive. It is intended to ensure the educational adequacy of such facilities and the safety of students who attend them. Permitting a local zoning board to issue rulings on these subjects contrary to the DOE's rulings would usurp the DOE's jurisdiction and prevent the accomplishment and execution of the Legislature's intent. Accordingly, Judge Passero properly concluded that the EFCFA gave the DOE jurisdiction over off-site safety issues.

## IV.

Van Ness next contends that Judge Passero erred in finding the Zoning Board's decision arbitrary, capricious, and unreasonable. This contention lacks merit.

It was undisputed that the proposed school was an inherently beneficial use, and thus, satisfied the positive criteria. *See, e.g., Northeast Towers, Inc. v. Zoning Bd. of Adj. of Borough of W. Paterson*, 327 *N.J.Super.* 476, 487, 744 *A.*2d 190 (App.Div.2000). Therefore, the Zoning Board's sole responsibility was to determine whether the BOE satisfied the negative criteria.

Satisfaction of the negative criteria here does not involve an enhanced quality of proof, as with uses that are not inherently beneficial. *Sica, supra,* 127 *N.J.* at 154–55, 160–61, 603 *A.*2d 30; *Med. Ctr. at Princeton v. Twp. of Princeton Zoning Bd.,* 343 *N.J.Super.* 177, 200, 211–13, 778 *A.*2d 482 (App.Div.2001). Rather, it involves a balancing of the positive and negative criteria. *Sica, supra,* 127 *N.J.* at 163–65, 603 *A.*2d 30.

> First, the board should identify the public interest at stake. Some uses are more compelling than others....

> Second, the Board should identify the detrimental effect that will ensue from the grant of the variance. Certain effects, such as an increase in traffic, ... or "some tendency to impair residential character, utility or value," ... will usually attend any nonresidential use in a residential zone. When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria.
>
> Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. [ ] If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions[.]
>
> Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.
>
> [*Id.* at 165–66, 603 *A.*2d 30 (citations omitted).]

"This procedure, while making it more difficult for a municipality to exclude inherently beneficial uses, permits exclusions when the negative impact of a use is significant." *Med. Ctr. at Princeton, supra,* 343 *N.J.Super.* at 201, 778 *A.*2d 482.

Based upon our careful review of the record, we discern no reason to disturb Judge Passero's decision. We are satisfied that the evidence before the Zoning Board was "overwhelmingly in favor of" the BOE. *Nextel, supra,* 361 *N.J.Super.* at 38, 824 *A.*2d 198. The BOE satisfied the standard of proof for the positive and negative criteria, entitling it to the requested relief. Judge Passero properly found that the Zoning Board's denial of the requested variance was arbitrary, capricious, and unreasonable. We affirm substantially for the reasons expressed in the judge's well-reasoned, comprehensive, written opinions, dated November 9, 2006 and August 30, 2007.

## V.

▮ Finally, Van Ness contends for the first time on appeal that the BOE's notice about the use variance application was defective, and that Judge Passero erred by failing to correct the Zoning Board's refusal to consider site plan issues such as on-site parking, drainage, and the ability of the proposed school's air conditioning system to insulate the students from tractor trailers' diesel fumes. Van Ness also argues for the first time in its reply brief that an August 6, 2007 amendment of the MLUL, *N.J.S.A.*

40:55D–70(c)(2), overruled prior case law on the subject and should be applied under the time of decision rule. It also relies in its reply brief on an excerpt from a 2008 master plan reexamination report, which it did not submit to Judge Passero or on appeal.

We will "decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concerns matters of great public interest.'" *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A*.2d 142 (1973) (quoting *Reynolds Offset Co., Inc. v. Summer*, 58 *N.J.Super.* 542, 548, 156 *A*.2d 737 (App.Div. 1959), *certif. denied*, 31 *N.J.* 554, 158 *A*.2d 453 (1960)). Also, we may not consider claims raised outside the record, *ibid.; R.* 2:5–4, or documents not presented to the trial judge, *Cipala v. Lincoln Technical Inst.*, 179 *N.J.* 45, 52, 843 *A*.2d 1069 (2004); *Soc'y Hill Condo. Ass'n Inc. v. Soc'y Hill Assocs.*, 347 *N.J.Super.* 163, 177–78, 789 *A*.2d 138 (App.Div.2002).

The issues Van Ness raises do not go to the trial court's jurisdiction, nor has Van Ness presented any argument that the issues concern matters of great public interest. Also, it is procedurally improper to raise issues for the first time in a reply brief, as Van Ness had done here. *Borough of Berlin v. Remington & Vernick Eng'rs*, 337 *N.J.Super.* 590, 596, 767 *A*.2d 1030 (App.Div.), *certif. denied*, 168 *N.J.* 294, 773 *A*.2d 1158 (2001).

Affirmed.