**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0511-19
           A-0636-19

1 MEMORIAL DRIVE LLC,

     Plaintiff-Appellant,

v.

160 WEST BROADWAY
ASSOCIATES, LP, and
PATERSON PLANNING BOARD,

     Defendants-Respondents.

_____

RIVERVIEW TOWERS I, LLC and
RIVERVIEW TOWERS II, LLC,

     Plaintiffs-Appellants,

v.

160 WEST BROADWAY
ASSOCIATES, LP, CITY OF
PATERSON PLANNING
BOARD and 1 MEMORIAL
DRIVE, LLC,

     Defendants-Respondents.

_____

Argued May 17, 2021 – Decided August 13, 2021

Before Judges Hoffman, Suter and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket Nos. L-3874-17 and L-3935-17.

Justin D. Santagata argued the cause for appellant 1 Memorial Drive, LLC, in A-0511-19 (Kaufman Semeraro & Leibman, LLP, attorneys; Justin D. Santagata, on the brief).

Ira E. Weiner argued the cause for appellants Riverview Tower I, LLC, and Riverview Tower II, LLC, in A-0636-19 (Beattie Padovano, LLC, attorneys; Ira E. Weiner, of counsel and on the briefs).

John M. Carbone argued the cause for respondent 160 West Broadway Associates, LP, (Carbone and Faasse, attorneys; John M. Carbone, on the brief).

Alfred V. Acquaviva argued the cause for respondent City of Paterson Planning Board Board.

PER CURIAM

In this consolidated appeal, plaintiff 1 Memorial Drive, LLC (Memorial), and plaintiffs Riverview Towers I, LLC, and Riverview Towers II, LLC (Riverview Towers), appeal from the September 5, 2019 Law Division judgment affirming the decision of the City of Paterson Planning Board (the Board), which granted the site plan application of defendant 160 West Broadway Associates, LLC (160 West). The application proposed to expand

and improve a supermarket site, which had been vacant for five years, by converting approximately 7,000 square feet of storage space into retail space.

On appeal, plaintiffs contend the Board adopted a legally deficient resolution, which contained insufficient findings of fact and conclusions of law. In addition, they assert the Board inappropriately relied on the report of its planner and failed to properly reconcile conflicting expert testimony regarding the plan's traffic circulation pattern.

Based on our review, the record does not support the Law Division judge's "finding that [the Board] did not act arbitrarily, capriciously, or unreasonably in approving the application." The Board's memorializing resolution approved a truck circulation pattern that would violate the New Jersey Motor Vehicle Code (the MV Code); in addition, the resolution failed to set forth adequate findings to support the Board's decision. We therefore reverse.

I.

On June 30, 2017, 160 West applied for preliminary and final site-plan approvals, with variances, to renovate, expand, and re-occupy retail space (the supermarket) located in its strip mall on West Broadway in Paterson. 160 West Broadway (the property) lies on the north side of County Road 673,

3

bounded on the west by Cliff Street and on the north by Christopher Columbus Drive/Northwest Street. Located near four high-rise residential apartment buildings called the Riverview Towers, the property measures 1.61 acres in a trapezoidal shape. The property contains an existing retail strip-mall composed of six units, the largest of which was last used as a supermarket, occupying almost 18,000 square feet of the mall.

The property is in Paterson's First Ward Redevelopment Area in the C-2 general commercial district. The First Ward Redevelopment Plan (the Redevelopment Plan) supersedes all use, bulk and design standards in the Paterson zoning ordinance and governs the development of the property. The Redevelopment Plan states that "any deviation from standards of this Plan that results in a 'd' variance pursuant to N.J.S.A. 40:55D-70d shall be addressed as an amendment to the Plan rather than via variance relief through the Paterson Zoning Board of Adjustment."

In June 2017, 160 West, as owner/landlord, applied for preliminary and final site plan approvals and "c" bulk variances (the application) for a tenant fit-out for the back warehouse section of the property. The application proposed to expand the existing supermarket to occupy 24,731 square feet of

A-0511-19

floor area by converting 6,702 square feet of warehouse space previously used for storage.

The application presented three circulation plans on how the trucks would enter and exit the property. The first circulation plan depicted a truck entering from the north and traveling south. The truck would have to stop on West Broadway near Cliff Street, wait for an opening in traffic, and then make a left turn into an exit-only driveway (at the north end of the property), cross parts of two parking spaces, continue halfway down the front of the building, and then maneuver in reverse over three parking spaces to access the loading dock on the northeast side of the building.

The second circulation plan considered a tractor-trailer proceeding north on West Broadway, passing the exit-only driveway at the north end of the property, stopping and then backing-up on West Broadway and blocking both lanes of traffic while maneuvering in reverse on West Broadway and backing into the site through an exit driveway to access the loading dock.

The third circulation plan depicted a tractor-trailer heading north on West Broadway, maneuvering into and blocking oncoming traffic, and swinging into the access driveway's exit at the north end of the property. The truck would need to make many forward-reverse maneuvers in the parking lot

5

to back into the loading dock without reentering traffic on West Broadway. This plan would traverse three parking spaces and would impact the City sidewalk and public right-of-way at the corner of Cliff Street and West Broadway.

Hongchao Yu, Patterson's city engineer, evaluated the circulation plans and traffic diagram. In an August 1, 2017 email to the Board's planner, Michael Deutsch, Yu wrote that the circulation plan would create "severe adverse impact" on both traffic safety and mobility. The email stated:

> At your request, I reviewed the provided plan for the above project. In reviewing the particular Truck Circulation Plan, the design truck WB-50 is designed to completely occupy and block West Broadway when maneuvering into its loading dock. To consider that West Broadway is a major arterial road and one of [the] busiest roads so that severe adverse impact on both traffic and safety and mobility is obviously predicted, I cannot be in support of the design. In addition, since West Broadway is also a County Road, I don't think the County will approve it either.
>
> FYI, the provided Truck Circulation Plan is not correctly scaled.

Deutsch concurred with Yu's opinion that the truck circulation plan was unsafe.

The Board identified three variances necessary for 160 West's application: 1) a front yard setback 49.9 feet from West Broadway, when only

6

five feet was permitted; 2) parking spaces eight feet six inches wide, when nine feet was required; and 3) no curbed landscaping island, equal to at least five percent of the parking area, where a parking lot contains over twenty-five parking spaces.[1]

On September 6, 2017, at the first Board hearing on the application, 160 West presented three witnesses:  Calisto Bertin (an engineering expert), VJ Aynilian[2] (a property manager), and Brigette Bogart[3] (a professional planner).

---

[1] Examination of the Redevelopment Plan indicates the application required at least three more variances, including:  a) "no building must front a parking lot either visually or physically"; b) "the façade of the commercial street shall be made permeable"; and c) chain link fences are prohibited around parking lots. In fact, as we discuss later in this opinion, Riverview Towers contends the application required twelve more variances.

[2] The commercial property manager for VAP International (VAP), Aynilian testified that he managed the day-to-day operations of a commercial portfolio that included the property.  He explained that VAP purchased the property in the early '90s and that the supermarket "has always been a supermarket."  The proposed expanded supermarket, if approved, would hopefully "act as the anchor for the shopping center and . . . attract more satellite stores . . . ."

[3]  Accepted as a planning expert, Bogart explained that the application involved "a lawfully existing site, . . . a lawfully existing building, and . . . permitted uses"; additionally, the application abided by "the most recent 2015 resolution of approval by the Planning Board."  In her professional opinion, the project provided planning benefits, "because you're in a redevelopment area.  You don't want to have a building sit [and] lie vacant, you want economic viability . . . ."

A-0511-19

Bertin testified that he was involved in the preparation of the site plan that was originally dated August 25, 2016, and last revised on August 25, 2017. He explained improvements had been made to the previously-approved plan, including moving the parking away from the sidewalk, replacing the entire sidewalk and curb on West Broadway, replacing the driveway, and improving the drainage. Bertin explained that the applicant planned to re-stripe the parking lot and put in stop signs. By restriping the parking lot, the applicant would increase the number of spaces by one or two in the back right corner, because the spaces were only eight-and-a-half feet wide.

Bertin stated that the approval obtained back in December 2015 was conditioned on obtaining "County site plan approval." This approval was conditioned on the truck maneuvering on the property. He explained:

> What the County approved was that a truck would back into the site from West Broadway and there's an agreement that's been processed with the County. The County actually has some procedures for I think it's called short-term road closures. These are closures of just a couple of minutes where there's a requirement to have flaggers and people direct traffic to allow the truck to back into the site. And there's a strict procedure and that's been agreed to by the County.

When asked if it was legal to have commercial vehicles back up on West Broadway to enter the property, Bertin responded "yes," noting that "the

County approved it and as far as I know[,] under those conditions[,] it's legal."

He stated that he did not know if the new operator of the supermarket would restrict deliveries to only straight trucks and not tractor-trailers. When asked if there was enough space on the site to perform the truck maneuver, he responded:

> The problem is that if a truck were to come in say from the easterly driveway by the car wash, there's no way he can pull up far enough to back in. If he were to pull in the driveway and back up – again, there's not enough real estate. I guess if we excavated along Cliff Street, we might be able to get them to maneuver a couple of times, but there's not enough room on this site for a truck to pull up and back in. Usually we leave from the loading dock out a hundred feet for a truck to make the maneuver. Unfortunately, we don't have it.

Bertin admitted that the delivery trucks would have to back into the property in the middle of traffic on West Broadway, with the help of flaggers. Upon hearing this response, two Board commissioners expressed safety concerns.

160 West concluded its testimony at the September 6, 2017 hearing without presenting any expert testimony on its truck circulation plan and gave no indication it expected to present such testimony to the Board. When some Board members appeared uncomfortable with the truck circulation plan, counsel for 160 West requested the opportunity to "come back on the 27th" –

at that time, "I'll come back with an amended plan or I'll come back with a reason why I can't do an amended plan . . . ."

On September 27, 2017, 160 West returned to the Board. Rather than an amended plan, 160 West appeared with a traffic expert, without any prior notice. As a result, Riverview Towers' attorney objected and requested the Board require the expert to submit a report and grant Riverview Towers an opportunity to provide rebuttal expert testimony. The Board denied the request.

The Board then heard the testimony of 160 West's expert, Joseph Staigar, after recognizing him as a traffic expert. Staigar explained that he focused his review on "the deliveries and how the deliveries would take place, what the frequency is, and again how it would be actually facilitated by the site." Deliveries could "arrive at the site on a frequency of up to maybe ten times a day[,]" with most deliveries coming from "box trucks and the step vans" and would stay "completely contained within the site."

Staigar testified there would also be tractor-trailer deliveries to the site; however, those deliveries would be less frequent, zero to a maximum of two per day. There would be two sizes of tractor-trailers delivering to the site:

10

WB-40s and WB-50s.[4]  Deliveries involving WB-50s, which would be very infrequent (at most once a day), would have to back into the site from the northerly driveway, and would involve a "flagger" to control traffic.  He explained:

> I've watched traffic on West Broadway and the ability to make those maneuvers can be made.  Clear visibility.  Alignment of the roadway is straight and rather flat in the area.  So again, with the precautions that will be mandated as a condition of our approval with the County and could be put into a condition here with the Planning Board, it'll be a safe and efficient access for delivery trucks.

Staigar did not think the truck circulation maneuvers were unsafe and stated that if these types of maneuvers were prohibited, "you're going to find vacant pieces of property if you don't allow for these types of deliveries."  He added that his testimony on the frequencies of the deliveries was based entirely upon his discussions with the property owner.  He also said that the operator of the supermarket would supply the flaggers; if the operator did not, there would be no flaggers.  He did not know how that requirement would be enforced.

Staigar disagreed with the plans provided by the Board's traffic engineer that showed tractor-trailers would have to cross the opposite lane of traffic to

---

[4]  According to Staigar, "The WB[-]40 stands for [a] wheelbase 40 feet from the front axle to the center of the two rear axles[,]" and a WB-50 stands for a wheelbase fifty feet from the front axle to the center of the two rear axles.

back into the property. He stated, "I analyzed it myself and it does not have to cross. It may cross that centerline, the physical centerline of the road, but not into the opposing lane."

After Staigar completed his testimony, counsel for Riverview Towers renewed his request to present a rebuttal traffic expert because he received no notice that 160 West was going to present additional expert testimony. The Board ignored this request and voted four to two to approve 160 West's application. On October 19, 2017, the Board adopted a resolution memorializing approval of 160 West's application. That resolution was contingent upon "the applicant providing traffic control in the form of a 'flagger' to control incoming and outgoing tractor-trailer deliveries," and "the prohibition of all deliveries made by WB-50 tractor-trailers between the hours of 7:00 a.m. and 9:00 a.m. and 3:00 p.m. and 5:00 p.m."

On October 5, 2018, after plaintiffs filed complaints in lieu of prerogative writs challenging the Board's approval, the trial court remanded the matter to the Board to "supplement and clarify the record." The remand order specifically provided that "[t]he remand will be limited to permit [p]laintiffs to present expert testimony on the traffic issue only." The court's accompanying "Statement of Reasons" explained, "The Board deprived . . .

[p]laintiff[s] a fair opportunity to present a traffic expert. . . . The additional traffic information is necessary to assist the Board in making a fully informed decision on this pivotal issue and to complete the record for review on appeal." On December 19, 2018, the Board held the remand hearing and heard the testimony of Riverview Towers' expert, Gary Dean, a traffic engineer.[5]

Dean testified that he was asked to take a particular interest in the access to this property for trucks and deliveries for the proposed supermarket. His review focused on truck circulation and the method of operation as presented in terms of accommodating all sizes of trucks that would deliver to a supermarket tenant. He prepared a written study, dated October 30, 2018.

Dean reviewed the available maps and aerial photography, visited the property, and reviewed the plans as a desktop exercise. He found the proposed truck circulation plan was not a viable option for the property. "The proposed circulation either creates safety [concerns] with movements on the public street or it conflicts with vehicles on the site itself." According to Dean, the site plan, proposed "to alter the driveways from how they were originally

---

[5] Five days before the remand hearing, 160 West submitted a supplemental traffic report prepared by Staigar. Between the submission of the supplemental traffic report and the remand hearing, the trial court held a telephone conference and ruled that 160 West could not submit the report. Notwithstanding the court's ruling and the clear limits of the remand order, Staigar's supplemental traffic report was inexplicably distributed to the Board.

13

approved. And by that, the applicant propose[d] to make the easterly driveway both in and out and to also narrow the driveway, and also to narrow the exit only driveway at the westerly end of the site nearest Cliff Street."

Dean's major concern with the proposed truck circulation plan was the use of tractor-trailers, which would need to back into the site, obstructing all westbound traffic and blocking all lanes of traffic on West Broadway. In his opinion, "that is neither safe nor efficient." "It's not appropriate for trucks to be backing on a public street into private property and . . . it's contrary to a driver's expectation[,]" in addition to "be[ing] inherently unsafe[,] . . . . such a practice actually violates the law[,]" specifically N.J.S.A. 39:4-56 and N.J.S.A. 39:4-67.

Dean testified that the proposed use of "flaggers" to control traffic while the tractor-trailer maneuvers into the property was not feasible – "the problem with that practice is that's not allowed in New Jersey." He explained that there are only three categories of "people who are sanctioned under the motor vehicle [C]ode to lawfully direct traffic": law enforcement officers, crossing guards (who are essentially deputized as part of the police department), and construction flaggers in a "work zone." "None of those conditions would exist for this practice of essentially having a civilian come from the store or exit the

truck to stop and hope that traffic yields to the truck that needs to back up on the street." Furthermore, he believed that this maneuver would require two or more flaggers.

Dean also questioned the size of the box truck that 160 West indicated would use the site. Dean's exhibit depicted a single-unit, forty-foot box truck, the same size as refrigerated trucks commonly used to deliver produce or meat to supermarkets. 160 West's presentation, however, depicted a thirty-foot truck, with a smaller wheelbase.

Dean explained that to enter the site westbound on West Broadway,

> [t]he first thing the truck has to do . . . is cross the centerline, a conflict with eastbound traffic. . . . The truck then turns right and comes into the driveway. And . . . because the driveway was being narrowed, the truck swings across the exit lane of the driveway. So if there's a car trying to leave while this beverage truck or delivery truck arrives, he's stuck on the street. He has to wait for the car to clear. That impedes traffic.

Dean further explained that once the truck makes the initial right-hand turn, if there is a car parked in the first angled parking space, the truck would not fit; when the truck exits, if it turns left, there is no problem; but if it turns right, it will swing into the oncoming lane of traffic traveling east on West Broadway, "which in my opinion means the site has not been properly designed to

15

accommodate what I think is a very common and typical truck that would deliver to a supermarket."

Dean said that the applicant had "conceded that a tractor-trailer simply can't circulate without having to back up on a public street." A typical tractor-trailer is fifty-three feet long, but the applicant depicted a tractor-trailer that was only forty-eight feet, meaning it was more maneuverable. There was a "logical expectation" that this site would get deliveries using fifty-three-foot tractor-trailers, which made all of the circulation depicted on various plans by the applicant even more problematic.

Dean concluded:

> So in my opinion, reviewing this with an eye toward nothing more than public safety, I've concluded that this is not a viable plan. The practice as was presented violates several statutes in terms of motor vehicle flow, it would be contrary to a driver's expectation, and I think presents a public hazard to which this Board would be a part should you approve the plan as presented.

Nevertheless, Dean acknowledged that the traffic pattern that he was criticizing had been approved by the County Planning Board, but only with flaggers.

The Board questioned Dean about the fact that it proposed to restrict the time of deliveries (between 7:00 a.m. and 9:00 a.m., and 3:00 p.m. and 5:00

16

p.m.), and the testimony that there would be no more than two tractor-trailer deliveries per day. Dean responded that traffic was essentially the same just outside of "peak hours." Additionally, he testified that "safety is . . .binary; it either works or it doesn't[,]" regardless of how many deliveries were expected. "[I]t needs to be a safe operation irrespective of the frequency. That's my opinion."

Dean questioned how the operator of the supermarket could limit any particular vendor's delivery times; in addition he noted that the Board did not have any testimony from the proposed operator, so it really did not have evidence about the delivery frequency or the size of potential delivery trucks, or whether the operator could comply with the "flagger" requirement. Dean further explained that smaller trucks – not just tractor and trailers – would have serious problems maneuvering inside the property.

After hearing Dean's testimony, the Board again voted to approve 160 West's application. Many of the Board members commented on the purported need for a supermarket in the area in supporting approval of the application. The resolution, adopted by the Board on March 6, 2019, was contingent upon "the applicant providing traffic control in the form of a 'flagger' to control incoming and outgoing tractor-trailer deliveries;" and "the prohibition of all

17

deliveries made by WB-50 tractor-trailers between the hours of 7:00 a.m. and 9:00 a.m. and 3:00 p.m. and 5:00 p.m."

On September 5, 2019, the trial court affirmed the Board's approval. In a written opinion, the trial court acknowledged that the proposed traffic circulation plan was "not necessarily . . . the most feasible or logical one." In addressing plaintiffs' argument that the proposed traffic circulation plan would violate N.J.S.A. 39:4-56 and N.J.S.A. 39:4-67, the court stated that the traffic plan approved by the Board "has yet to violate [these] statutes. One cannot be charged or be found guilty of a motor vehicle offense without actually committing the act." This appeal followed.

II.

The decision of a municipal zoning board is entitled to substantial deference. Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296 (1965). This deferential standard is the same for both trial and appellate courts. Bressman v. Gash, 131 N.J. 517, 529 (1993). Due to their "peculiar knowledge of local conditions," municipal boards are afforded wide latitude in the exercise of their delegated discretion. Pierce Ests. Corp. v. Bridgewater Twp. Zoning Bd., 303 N.J. Super. 507, 514 (App. Div. 1997). Courts reviewing a municipal board's action on zoning applications are limited to

18

determining whether the board's decision was arbitrary, capricious, or unreasonable. Bressman, 131 N.J. at 529; Med. Ctr. at Princeton v. Princeton Zoning Bd., 343 N.J. Super. 177, 198 (App. Div. 2001). "However, because the interpretation of a statute or ordinance presents essentially a legal issue, conclusions of a municipal board on matters of statutory interpretation are not entitled to any particular deference." N.Y. SMSA v. Bd. of Adjustment, 370 N.J. Super. 319, 331 (App. Div. 2004).

The Board's Resolution

Plaintiffs contend that the Board's resolution was legally deficient because it contained insufficient findings of fact and conclusions of law. They argue that the resolution must contain adequate independent findings of fact and conclusions of law and cannot merely rely on the Board planner's report; in addition, they contend the Board failed to properly reconcile the conflicting expert testimony regarding the traffic circulation pattern. We agree.

Based on our review, the trial court erred by affirming the Board's resolution because the resolution was inadequate as a matter of law. At a minimum, the legal insufficiency of the resolution would warrant a remand to the Board for reconsideration and specific factual findings. N.Y. SMSA, 370 N.J. Super. at 332-33. However, because the record demonstrates that the

19

Board's approval of 160 West's application was arbitrary, capricious, and unreasonable, compelling a reversal of the Board's actions, we decline to remand for reconsideration and specific factual findings.

a.    Findings of Fact — Testimony

Riverview Towers argue that the Board's resolution must contain adequate independent findings of fact and conclusions of law, and cannot merely rely on the Board planner's report.  According to Riverview Towers, "With only a few minor departures, the Board's resolution is lifted word-for-word from the Board planner's report. . . . The only differences between the resolution and Deutsch's recitation of his report in the record, are where [the Board's planner] made comments that would negatively affect the application." Riverview Towers' argument has merit.

A land use board's decision regarding the relief requested by an applicant must be embodied in the form of a written resolution, which includes findings of fact and conclusions of law.  Id. at 332; N.J.S.A. 40:55D-10(g). The requirement of a memorializing resolution is set forth in N.J.S.A. 40:55D-10(g), which provides:

> The municipal agency shall include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the

decision to writing. The municipal agency shall provide the findings and conclusions through:

(1) A resolution adopted at a meeting held within the time period provided in the act for action by the municipal agency on the application for development; or

(2) A memorializing resolution adopted at a meeting held not later than 45 days after the date of the meeting at which the municipal agency voted to grant or deny approval. . . . If the municipal agency fails to adopt a resolution or memorializing resolution as hereinabove specified, any interested party may apply to the Superior Court in a summary manner for an order compelling the municipal agency to reduce its findings and conclusions to writing within a stated time, and the cost of the application, including attorney's fees, shall be assessed against the municipality.

In order to satisfy this requirement:

The factual findings set forth in a resolution cannot consist of a mere recital of testimony or conclusory statements couched in statutory language. Rather, the resolution must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the applicant's variance request in accordance with the statute and in light of the municipality's master plan and zoning ordinance. Without such findings of fact and conclusions of law, the reviewing court has no way of knowing the basis of the board's decision.

[Id. at 332-33 (citations omitted).]

21

In <u>Smith v. Fair Haven Zoning Bd. of Adj.</u>, 335 N.J. Super. 111, 123 (App. Div. 2000), where the zoning board granted the applicant a dimensional bulk variance, we found the board's resolution to be "woefully inadequate." The resolution did not specify whether the variance was granted because of undue hardship caused by the unique condition of the land or structure, or because it afforded an opportunity for improved zoning and planning. <u>Ibid.</u> Nor did it describe or specify the unique condition of the property or structure resulting in undue hardship under (c)(1) or for improved zoning under (c)(2). <u>Ibid.</u> "The Zoning Board's enigmatic reference to 'providing additional space,' as an appropriate zoning objective, was far too nebulous a finding upon which to ground the grant of a (c)(1) or (2) variance." <u>Ibid.</u> As a result, we reversed the variance approval. <u>Ibid.</u>

Here, with only a few minor departures, paragraphs one through twenty-three of the resolution are a verbatim recitation of the planner's report. At the hearing on September 6, 2017, Deutsch read a significant portion of his report into the record, and the resolution includes most of what he read, except for the portions of his report that would have negatively affected the application.

A review of the resolution establishes that the Board made no independent findings of fact. While the "[w]hereas" clauses set forth who

22

testified at the hearings – Bertin (engineer expert), Aynilian (property manager), Bogart (professional planner), Staigar (160 West's traffic expert), and Dean (Riverview Towers' traffic expert) – the resolution contained no summary of their testimony, made no specific findings of fact as to any of their testimony, and made no specific findings of credibility as to any of the witnesses. We conclude the Board made insufficient findings of fact to satisfy the requirements of N.J.S.A. 40:55D-10. N.Y. SMSA, 370 N.J. Super. at 332-33.

b.    Finding of Facts and Conclusions of Law – Conflicting Expert Testimony

Based upon our review of the record, the Board failed to properly reconcile the conflicting expert testimony on traffic circulation.

Zoning boards may choose which witnesses, including expert witnesses, to believe. El Shaer v. Plan. Bd., 249 N.J. Super. 323, 329 (App. Div. 1991). Although a board "is not bound to accept the testimony of the expert, its determination must be made on a rational and reasonable basis." Reich v. Fort Lee Zoning Bd., 414 N.J. Super. 483, 504-05 (App. Div. 2010). Indeed, to be binding on appeal, that choice must be reasonably made. Kramer, 45 N.J. at 288. Further, "the choice must be explained, particularly where the board

rejects the testimony of facially reasonable witnesses." Bd. of Educ. v. Zoning Bd., 409 N.J. Super. 389, 434-35 (App. Div. 2009).

As noted, aside from identifying the experts who testified at the hearings, the resolution did not summarize their testimony and made no credibility determinations. Staigar's testimony stands in direct conflict with Dean's testimony, and the opinions of the Board's planner and Paterson's city engineer. The Board did not resolve the conflicting testimony. The resolution did not specifically reject Dean's testimony, nor did it state that Staigar's testimony was more persuasive. It also did not attempt to reconcile the conflicting testimony; instead, it merely made conclusory statements such as "[t]he applicant has provided testimony to the Board's satisfaction with regard to these issues[,]" without explaining what testimony it relied upon to approve the application, or why. While the approval of the application indicates the Board chose to accept Staigar's opinion over Dean's opinion, it is not clear why it chose to do so. Because the Board did not explain its choice, Bd. of Educ., 409 N.J. Super. at 434-35, it made insufficient findings of fact to satisfy the requirements of N.J.S.A. 40:55D-10. N.Y. SMSA, 370 N.J. Super. at 332-33.

c.    Finding of Facts and Conclusions of Law – Variance Application

An applicant for a variance "bears the burden of producing a preponderance of competent and credible evidence" to satisfy "the statutory prerequisites for a variance, a burden which applies to both the positive and negative criteria." Menlo Park Plaza Assocs. v. Plan. Bd., 316 N.J. Super. 451, 461 (App. Div. 1998). However, judicial review of the decision of a planning board to grant or deny a variance is limited. Bressman, 131 N.J. at 529. "A board's decision 'is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable.'" Smart SMR of N.Y., Inc. v. Fair Lawn Bd. of Adj., 152 N.J. 309, 327 (1998) (quoting Sica v. Bd. of Adj., 127 N.J. 152, 166-67 (1992)). We defer to the board's decision "if it is supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion." Ibid.

This deferential standard of review stems from the discretion vested in local bodies by the Legislature, and the recognition that local officials who are familiar with their community's characteristics and interests are best equipped to assess the merits of an application for development. Med. Ctr. at Princeton, 343 N.J. Super. at 198. Because of their particular knowledge of local conditions, planning boards must be allowed wide latitude in the exercise of their delegated discretion. Kramer, 45 N.J. at 296. Therefore, "courts

ordinarily should not disturb the discretionary decisions of local boards that are supported by substantial evidence in the record and reflect a correct application of the relevant principles of land use law." Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 58-59 (1999).

160 West sought a variance pursuant to N.J.S.A. 40:55D-70(c)(1) and (c)(2). To obtain a "hardship" variance under N.J.S.A. 40:55D-70(c)(1), an applicant must establish the following "positive" criteria:

> Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property . . . .

In addition to demonstrating the above "positive" criteria, N.J.S.A. 40:55D-70 requires an applicant for any variance to demonstrate the following "negative" criteria:

> No variance or other relief may be granted under the terms of this section . . . without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not

substantially impair the intent and the purpose of the zone plan and zoning ordinance.

To obtain a "flexible" variance under N.J.S.A. 40:55D-70(c)(2), an applicant must establish the negative criteria, set forth above, and the following positive criteria:

> [W]here in an application or appeal relating to a specific piece of property the purposes of this act . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, grant a variance to allow departure from regulations pursuant to article 8 of this act . . . .

The grant of relief under (c)(2) is not based on hardship. Green Meadows at Montville, LLC v. Plan. Bd., 329 N.J. Super. 12, 22 (App. Div. 2000). Instead, it

> must be rooted in the purposes of zoning and planning itself and must advance the purposes of the [Municipal Land Use Law]. The grant must benefit the community in that it represents a better zoning alternative for the property[,] and may not be granted merely to advance the purposes of the owner. Thus, the focus in a c(2) case is not whether the current zoning ordinance creates a "hardship" on the owner warranting a relaxation of the standard, but on the characteristics of the land that present an opportunity for improved zoning and planning that will benefit the community.
>
> [Ketcherick v. Mountain Lakes Bd. of Adjustment, 256 N.J. Super. 647, 657 (App. Div. 1992) (alterations

in original) (emphasis, citations, and internal quotations omitted).]

As previously noted, the resolution contained no summary of the testimony presented at the hearing, made no specific findings of fact as to any of the witnesses' testimony, and made no specific findings of credibility. Plaintiffs claim the resolution was inadequate because it did not contain independent findings of fact and conclusions of law, merely parroted the planner's report, and did not explain why it determined to grant the bulk variance. We agree.

The Board identified three variances necessary for 160 West's application: 1) a front yard setback 49.9 feet from West Broadway, when only five feet was permitted; 2) parking spaces of eight feet six inches wide, when nine feet was required; and 3) no curbed landscaping island of at least five percent of the parking area where a parking lot contains over twenty-five parking spaces.

As to the parking spaces, the resolution provided:

> The applicant has not provided floor plans or building elevations. The on-site truck traffic circulation indicates that of the [forty-six] off-street parking spaces, which require a variance for being proposed at [eight] feet [six] inches and not the required [nine] feet, may need further reduction to account for adding an on-site turnaround space, creating one or more cart

A-0511-19

corral areas and six parking spaces that the tractor-trailer will travel over and on. Additionally, a trash dumpster has not been located, which may take up one or more parking spaces. The applicant has provided testimony to the Board's satisfaction with regard to these issues.

However, the resolution does not identify the testimony or explain how the testimony satisfied the requirements for a variance.

As to the grant of all three variances requested, in general, the resolution provided as follows:

24. The granting of the subject site plan application and bulk variances will have no adverse impact upon noise, light, air, traffic, health, or safety in the community, nor will it impair the intent and purpose of the Master plan.

25. The Planning Board determined that the project will not have an adverse impact on the traffic in the community and that the traffic will operate safely and efficiently. The Planning Board based this determination on the experience and knowledge of the area of the board members and the credibility of the applicant's experts. The Passaic County Planning Board also issues a conditional approval, and the main potential traffic impacts are on West Broadway, a County road.

26. The proposed site plan and bulk variances will have no unusual impact upon the ultimate usage of the land.

27. Evidence presented by the applicant at the aforementioned public hearing shows that the

strict application of the city ordinances would present practical difficulties and undue hardship upon the development of this property, said difficulties being peculiar and exceptional to this property.

28. The applicant has further shown that the relief as requested could be granted without substantial detriment to the public good and said approvals would not impair the intent and purpose of the zoning ordinances of the City of Paterson.

29. All of the applicant's representations and stipulations made to the Planning Board in this application and at the said public hearing are regarded as true and accurate. The Planning Board has specifically relied upon the applicant's stipulations and representations in granting this approval. In the event that any of the applicant's stipulations or representations are inaccurate this approval shall be declared null and void.

As noted, the Board's resolution merely contained a conclusory recitation of the statutory language as support for its grant of the variances. It provided no summary of the testimony before the Board, nor did it provide an adequate explanation as to "why" the Board found that the (c)(1) and (c)(2) variance had been satisfied. As noted, mere conclusory recitation of the statutory language does not satisfy a land use board's responsibility. Loscalzo v. Pini, 228 N.J. Super. 291, 305 (App. Div. 1988). See also Morris Cnty. Fair Hous. Council v. Boonton Twp., 228 N.J. Super. 635, 646 (Law Div. 1988)

A-0511-19

(noting that resolution consisting almost entirely of quotations from experts' reports did not fulfill board's responsibility to make findings of fact and conclusions of law).

In addition, as in Smith, the resolution did not discuss the (c)(1) and (c)(2) variances in any detail. Moreover, the resolution did not address the reasons the Board found that 160 West had satisfied the positive and negative criteria under either the (c)(1) or (c)(2) variance; therefore, effective review is impossible. Witt v. Borough of Maywood, 328 N.J. Super. 343, 455 (App. Div. 2000). Accordingly, we hold that the trial court erred when it affirmed the Board's resolution because the resolution was inadequate as a matter of law.

Violation of the MV Code

Plaintiffs contend that the Board's approval was arbitrary, capricious, and unreasonable and should be reversed because the proposed traffic circulation plan, which requires delivery trucks to back up and block both lanes of traffic on West Broadway, would violate two sections of the MV Code: N.J.S.A. 39:4-56 and N.J.S.A. 39:4-67. According to Riverview Towers, the trial judge's opinion "recognized the illegality of the proposed delivery plan" and "understood the Board's decision validated illegal conduct."

31

Riverview Towers argues that the Board's resolution is internally inconsistent "because it requires compliance with all laws while simultaneously approving the tractor-trailer delivery plan that will not comply with the State motor vehicle laws."

Plaintiffs also argue that Tubular Serv. Corp. v. Comm'r of State Highway Dep't of N.J., 77 N.J. Super. 556 (App. Div.), aff'd o.b., 40 N.J. 331 (1963), supports their argument regarding the illegality of the traffic maneuver the Board approved. Memorial further argues that "[t]he supposed approval of 160 West's traffic circulation proposal by the Passaic County Planning Board does not save the Board's approval."

Appellate review of a trial court's conclusions of law is de novo, and we do not afford special deference to its interpretation of the law or the legal consequences that stem from its fact findings. Little v. KIA Motors Am., Inc., 425 N.J. Super. 82, 90 (App. Div. 2012) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)); Zaman v. Felton, 219 N.J. 199, 216 (2014).

N.J.S.A. 39:4-56 provides: "No person shall drive or conduct a vehicle in such condition, so constructed or so loaded, as to be likely to cause delay in traffic or accident to man, beast or property." N.J.S.A. 39:4-67 provides:

32

No vehicle or street car shall be permitted by the owner or driver thereof to so occupy a street as to interfere with or interrupt the passage of other street cars or vehicles, nor shall the driver of a vehicle or street car drive such vehicle or street car into an intersection if preceding traffic prevents immediate clearance of the intersection.

First, Riverview Towers argue that the proposed traffic circulation plan would violate N.J.S.A. 39:4-56 and N.J.S.A. 39:4-67, and that the trial court "recognized the illegality of the proposed delivery plan." The trial court's conclusion that "[i]t is clear that utilizing a WB-50 tractor-trailer as proposed would be violative of both statues" was supported by the record. Both the Board's planner and the City's engineer expressed concern about the safety and legality of the traffic circulation plan, and Riverview Towers' traffic expert specifically testified that the proposal involved illegal traffic maneuvers.

The trial court's holding that the Board did not act arbitrarily, capriciously, or unreasonably in approving the application, knowing that violations of the MV Code would occur, does not follow logically. As the court acknowledged, approval of this application could result in numerous violations of the MV Code at the property. Such violations are contrary to the resolution, which specifically states that "[t]he applicant shall comply with all federal, state, and county laws, rules and regulations . . . ." Thus, the Board

acted arbitrarily, capriciously, and unreasonably when it approved an application that would violate the MV Code and contradicts the express language of the very resolution that approved the application. We reject the trial court's decision to uphold the resolution based upon the fact that "[t]he traffic plan adopted by . . . the Board has yet to violate the aforementioned statutes."

Next, plaintiffs argue that Tubular supports reversal in this case. Although not a land use case, we find it persuasive as it supports the argument that the proposed traffic circulation pattern violates the MV Code. In Tubular, the plaintiff sought a condemnation award as a result of the fact that the State had erected a barrier on Route 1 that interfered with the ability of tractor-trailers to access plaintiff's property. 77 N.J. Super. at 558. The court noted that "plaintiff's case is premised upon interference with its previous unlawful practice of bringing its inbound trailer trucks, approaching on the westerly highway lanes, over onto the easterly or northbound lanes of the highway . . . to maneuver the vehicles into its building." Id. at 561. It found that the plaintiff's practice was contrary to N.J.S.A. 39:4-56 and N.J.S.A. 39:4-67, which prohibited the use of the opposite lane of traffic. Ibid.

34

The court in Tubular determined that where "the action of the State complained of as impairing highway access to private property does not interfere with lawful means of access but only prevents vehicular access effected in a manner necessarily violative of reasonable highway safety statutes, no claim of compensable taking can be founded thereon." Id. at 562. It further noted, "[i]f plaintiff no longer has any suitable access to his property, this should be regarded . . . as attributable not to the entirely proper action of the [State] but to the unsuitable disposition of his facilities for his particular commercial needs and purposes." Id. at 565.

Here, as in Tubular, the blocking of a public road to facilitate access onto private property would violate N.J.S.A. 39:4-56 and N.J.S.A. 39:4-67. 160 West's decision to expand the pre-existing building into a much larger supermarket that would require larger tractor-trailer deliveries and failure to reconfigure the property or design a different traffic pattern, worsens, rather than cures, these violations.

Lastly, Memorial argues that "[t]he supposed approval of 160 West's traffic circulation proposal by the Passaic County Planning Board does not save the Board's approval." We agree.

35

The Board's resolution states: "The applicant clarified that the Passaic County Planning Board approved the tractor-trailer maneuvering patterns"; however, the record contains no evidence as to what was actually submitted to the Passaic County Planning Board and, therefore, what it actually approved.

Nevertheless, the Board was required to address the issue of safe ingress and egress onto the property as part of its site plan review. El Shaer, 249 N.J. Super. at 330. Concluding that the Passaic County Planning Board had already approved the tractor-trailer maneuvering patterns, without sufficient credible evidence, does not satisfy that obligation. Ibid.

We conclude the trial court erred when it affirmed the resolution because the Board's approval was arbitrary, capricious, and unreasonable since compliance with the proposed traffic circulation pattern would violate the MV Code.

Lack of Evidence/Hearsay/Net Opinion

Riverview Towers urges us to reverse, contending the Board's approval was arbitrary, capricious, and unreasonable because it was not based on substantial credible evidence in the record and the Board relied on unsupported hearsay and net opinions from 160 West's traffic expert. Specifically, they argue that: (a) the Board ignored the testimony of its traffic expert, Dean,

36

without explanation; (b) the Board's approval was not based on substantial credible evidence in the record to support either the requested variances or the site plan; (c) Staigar's testimony relied on uncorroborated hearsay not otherwise substantiated in the record; and (d) Staigar's testimony was primarily a net opinion the Board should have rejected. These contentions have merit.

(a)    Dean's Expert Testimony

First, Riverview Towers contends the Board improperly ignored Dean's "persuasive expert testimony . . . that the tractor-trailer delivery plan proposed was inherently unsafe and illegal as proposed." We agree.

As noted, aside from identifying the experts who testified at the hearings, the resolution does not provide a summary of their testimony, makes no credibility determinations, and does not indicate why the Board accepted Staigar's testimony over Dean's. For the reasons already expressed, these insufficient findings fail to satisfy the requirements of N.J.S.A. 40:55D-10, making our review impossible.

(b)    Substantial Credible Evidence

Second, Riverview Towers contend that the Board's approval was arbitrary, capricious, and unreasonable because it was not based on substantial credible evidence in the record to support either the requested variances or the

37

site plan. Riverview Towers argue that 160 West failed to present sufficient proof of the positive criteria to satisfy the standards in N.J.S.A. 40:55D-70(c). Thus, 160 West "did not prove hardship or substantial public benefit from granting the variances," and the "Board skirted the safety issues because they like the use." This argument has merit.

The resolution did not discuss the (c)(1) and (c)(2) variances in any detail. Moreover, the resolution did not address the reasons the Board found that 160 West had satisfied the positive and negative criteria. The Board therefore made insufficient findings of fact to satisfy the requirements of N.J.S.A. 40:55D-10. N.Y. SMSA, 370 N.J. Super. at 332-33.

(c)    Hearsay Testimony

Third, Riverview Towers contend that Staigar's testimony improperly relied on uncorroborated hearsay not otherwise substantiated in the record. It argues that much of Staigar's testimony relied on conversations with the owner of the property about the number of expected deliveries, but there was "nothing in the record to substantiate that the representation is a fair estimate." Therefore, the Board's reliance on Staigar's unsupported hearsay testimony was arbitrary, capricious, and unreasonable. We agree.

The Board was not bound by the Rules of Evidence. See N.J.S.A. 40:55D-10(e) (declaring that "[t]echnical rules of evidence shall not be applicable to the hearing" of a municipal land use agency); Baghdikian v. Bd. of Adjustment, 247 N.J. Super. 45, 49 (App. Div. 1991) (stating that zoning board "cannot be equated with courts" and procedural safeguards employed in judicial proceedings should not be "imported wholesale" into proceedings before land use board). However, zoning boards cannot rely upon unsubstantiated allegations. Bd. of Educ., 409 N.J. Super. at 435. "[A] fact finding or a legal determination cannot be based on hearsay alone. Hearsay may be employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony." Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 359 (2013) (quoting Weston v. State, 60 N.J. 36, 51 (1972)). Thus, when such conclusions are based on hearsay, the court must ensure there is "'a residuum of legal and competent evidence in the record to support it.'" Ibid. (quoting Weston, 60 N.J. at 51).

Staigar's testimony as to the number of anticipated deliveries to the property was admittedly hearsay – it was based entirely on his conversations with the property owner. Because there was no other evidence to substantiate Staigar's testimony on the number of deliveries, it is unclear whether his

39

testimony represented a fair estimate of the number of actual deliveries that could be expected at the property. Simply stated, Staigar's testimony regarding the number of deliveries was unsubstantiated hearsay.

(d)   Net Opinion

Last, Riverview Towers argue that the Board should have rejected Staigar's testimony regarding tractor-trailer deliveries not blocking both lanes of West Broadway as a net opinion. According to Riverview Towers, Staigar "had no support for this assertion[,]" and "[o]n cross-examination, he admitted he had no supporting documentation and that his opinion was based on his own analysis." Further, Staigar's opinion was contrary to 160 West's civil engineer's plan, which showed that the tractor-trailers would block both lanes of West Broadway. Staigar also "had no knowledge of what happened when the prior supermarket use was in operation years earlier, and whether the tractor-trailer deliveries . . . presented any problems." We agree that Staigar's testimony as to the traffic circulation plan was a net opinion.

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "Simply

40

put, the net opinion rule 'requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.'" State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). See also Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011) ("[A] trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified.").

The rules of evidence do not apply in administrative proceedings. N.J.R.E. 101(a)(3); see also N.J.S.A. 40:55D-10(e). Nonetheless, the policy of the net opinion rule has been applied in land use cases. New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adjustment, 160 N.J. 1, 16 (1999); Bd. of Educ., 409 N.J. Super. at 435. Indeed, zoning boards cannot rely upon unsubstantiated allegations, nor can it rely upon net opinions that are unsupported by any studies or data. Cell S. of N.J. v. Zoning Bd., 172 N.J. 75, 88 (2002).

Staigar testified that, although the plans indicated that tractor-trailers would have to cross into the opposing lane of traffic, he analyzed the traffic plan himself and disagreed. "[Trucks] may cross that centerline, the physical centerline of the road, but not into the opposing lane." However, he did not

provide an updated plan or any other report explaining his analysis. He did not give the "why" and "wherefore," or otherwise explain his analysis. He did not provide a foundation for his testimony. His testimony therefore amounted to a net opinion, Pierre, 221 N.J. at 53-54; Polzo, 196 N.J. at 583; Townsend, 186 N.J. at 494, and the Board should have lent no weight to it. See Nextel of N.Y., Inc. v. Borough of Englewood Cliffs Bd. of Adj., 361 N.J. Super. 22, 43 (App. Div. 2003) ("An expert opinion that is not factually supported is a net opinion or mere hypothesis to which no weight need be accorded.").

We further conclude the trial court erred by affirming the resolution because the Board's approval was arbitrary, capricious, and unreasonable since it was not based on substantial credible evidence in the record.

Variances Required by The Redevelopment Plan

Riverview Towers contend that the Board's approval was arbitrary, capricious, and unreasonable and should be reversed because 160 West did not apply for or obtain the necessary variances under the Redevelopment Plan. They argue that 160 West's application should have been evaluated under standards set forth in the Redevelopment Plan because "all the general zoning standards of the underlying C-2 (general commercial district) zone are superseded under the terms of the [Redevelopment] Plan." According to

A-0511-19

Riverview Towers, 160 West's application "deviated from the Redevelopment Plan standard – thus requiring variances – that were never addressed or proven by 160 West or considered by the Board."  "Even if some deviations are preexisting or are impractical to meet, [it was] 160 West's obligation to prove entitlement to a variance required by the [Redevelopment] Plan."

We hold the trial court erred when it affirmed the Board's resolution because the Board's approval was arbitrary, capricious, and unreasonable since it failed to properly consider the requirements of the Redevelopment Plan.

Planning boards have a duty to determine all variances required for a particular application.  See O'Donnell v. Koch, 197 N.J. Super. 134, 143 (App. Div. 1984) (finding local zoning boards have a duty to take cognizance of what variances are required in connection with an application, even if no evidence was presented regarding variances and no variance was specifically requested).

Here, the Board acknowledged that the application was under the purview of the Redevelopment Plan.  The Redevelopment Plan specifically provided:

> The Area shall be redeveloped in accordance with the standards detailed in this Redevelopment Plan.  The Plan supersedes the use, bulk, and design standard provisions of the Paterson Zoning Ordinance unless specifically referenced.  Other standards and submission requirements relating to all zones in

Paterson not specifically enumerated within as detailed in the Zoning Ordinance shall apply.

Any deviation from standards of this Plan that result in a "d" variance pursuant to N.J.S.A. 40:50D-70d shall be addressed as an amendment to the Plan rather than via variance relief through the Paterson Zoning Board of Adjustment "C" variance relief pursuant to N.J.S.A. 40:55D-70c and design waivers may be addressed by the Planning Board through the development application process. All developments must be approved by the Planning Board and shall be submitted through the normal site plan and subdivision procedures as identified by N.J.S.A. 40:55D, et seq.

Riverview Towers argues that the application deviated from the Redevelopment Plan, and the following required variances, which are in addition to the three variance we previously identified as improperly omitted:

1. Signage . . . shall be standardized so as to reduced visual clutter.

2. Provisions shall be provided to separate pedestrian from vehicular traffic within lots.

3. Parking lots must be buffered from the public right-of-way with a minimum of three feet and the buffer shall contain walls between two and four feet in height and landscaping.

4. The commercial parking areas shall only be lit without spilling onto neighboring properties and the lighting should conform to existing standards for brightness and spillage.

A-0511-19

5. Regarding landscaping, commercial parking lots coverage cannot exceed [eighty] percent, including at least [ten] percent of the lot landscape.

6. The parking lot must have one tree for every ten parking spaces, and the trees must provide shade.

7. At least fifty percent of the parking lot must be shaded within a [ten]-year growth period, and there are many other landscaping requirements not met by the application.

8. Parking lots with over [thirty] spaces must have a pedestrian walkway through the lot which must be of a different surface material and should be at least five feet wide.

9. Parking lots next to the public right-of-way must be buffered and segregated from the street with partition elements including fences, shrubs, raised paving that grades a level difference, and other methodologies.

Riverview Towers' argument has merit. The Redevelopment Plan zoning regulations supersede the zoning regulation contained in the Paterson Zoning Ordinance. 160 West asserted that it complied with the number of parking spaces required under the Redevelopment Plan, which was fewer than what was mandated by the C-2 commercial zone standards. However, 160 West did not identify any other requirements under the Redevelopment Plan, and

therefore failed to request any other variances. The Board likewise failed to identify or consider any additional variances under the Redevelopment Plan. Even if the deviations were preexisting or impractical to meet, it was 160 West's obligation to prove it was entitled to the necessary variances.

In its brief, the Board responds to Riverview Towers' argument as follows: "The appellant conveniently neglects to mention that the property was the subject of several applications over approximately [fifteen] years which, along with the subject application, addressed all of the issues that the appellant incorrectly states as part of the redevelopment plan." Even if the Board is correct, 160 West did not establish that the prior applications did, in fact, "address all of the issues" raised by Riverview Towers, which was its obligation. In fact, there was no substantive evidence presented that the prior applications sufficiently addressed those issues or the requirements of the Redevelopment Plan. Thus, the Board did not properly address the requirements of the Redevelopment Plan.

We hold that the trial court erred when it affirmed the resolution because the Board's approval was arbitrary, capricious, and unreasonable since it failed to properly address the requirements of the Redevelopment Plan.

Supplemental Expert Report

Memorial contends that 160 West "poisoned" the record when, "[d]espite the express limitations of the trial court's remand order, 160 West chose to submit a supplemental expert report in direct violation of the order."  As a result, the Board improperly considered Staigar's supplemental report.  We conclude his argument has merit since it is clear from the Board's deliberations that they did review and consider the report in violation of the court's order.  We therefore hold that the trial court erred by affirming the resolution because the Board's approval was arbitrary, capricious, and unreasonable since it considered evidence outside of the record.

"The factual determinations of the planning board are presumed to be valid and the exercise of its discretionary authority based on such determinations will not be overturned unless arbitrary, capricious or unreasonable."  Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 560 (App. Div. 2004).  "[T]he law presumes that boards of adjustment and municipal governing bodies will act fairly and with proper motives and for valid reasons."  Id. at 560-61 (quoting Kramer, 45 N.J. at 296).  "The arbitrary and capricious standard is analogous to the substantial evidence standard."  Rocky Hill Citizens for Responsible Growth v. Plan. Bd., 406 N.J. Super. 384, 411 (App. Div. 2009); see also Cell S. of N.J., 172 N.J. at 88-89.

47

Indeed, it is "essential that the [planning] board's actions be grounded in evidence in the record." Fallone Props., 369 N.J. Super. at 562.

Here, the Board acted improperly by considering Staigar's supplemental report. Indeed, the Board's counsel acknowledged that "[t]he court order specifically ruled . . . that [Dean would be] the only witness" at the remand hearing, and that "[t]here would be no other reports other than what was submitted last year on behalf of the applicant." However, Memorial correctly points out that the Board members reviewed, considered, and were influenced by Staigar's supplemental report.

At the December 19, 2018, remand hearing, Commissioner Brooks questioned Dean about his opinion and report:

> My concern, and I guess my question would be to you, is that we've had to review now two traffic reports. When does your traffic report become more adequate than the other person's traffic report? Because in looking at all of this and being here when the Board made the decision, I'm kind of confused as to what's the validity . . . over and above the original and the other traffic report?

Commissioner Brooks also said: "My second question I think is the interpretation of the N.J.S.A. 39:4-67. Here again the details of what this means varies from one report to the other. I mean, I see where . . . Mr. Staigar has taken apart your interpretation."

A-0511-19

The Board, or at the very least Commissioner Brooks, was improperly influenced by evidence outside of the record. Because it is impossible to ascertain the extent to which Staigar's supplemental report influenced the other Board members, we hold that the trial court erred when it affirmed the Board's resolution because the Board's approval was arbitrary, capricious, and unreasonable since it considered evidence outside of the record.

We recognize that boards have local knowledge of the community and this is the reason for our general deference. Jock v. Zoning Bd., 184 N.J. 562, 597 (2005). However, a board's decision still must have a factually substantiated basis, which was not demonstrated here. Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)E.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0511-19